**SPRINGWELL CORPORATION,**
Plaintiff,

v.

**FALCON DRILLING COMPANY,**
**INC., Defendant.**

**No. 96 Civ. 7463(SS).**

United States District Court,
S.D. New York.

May 4, 1998.

Opinion on Reconsideration Sept. 23, 1998.

Gage Buschmann & Pavlis, G. Robert Gage, Jr., Alfred U. Pavlis, New York City, for Plaintiff.

Battle Fowler LLP, Gerald J. Fields, Raymond J. Soffientini, New York City.

## MEMORANDUM OPINION AND ORDER

SOTOMAYER, District Judge.

The plaintiff brings this action claiming that it is entitled to a finder's fee, pursuant to an oral agreement, for introducing the defendant to an investment banking firm that later managed certain debt and equity offerings made by the defendant in 1994 and 1995. The defendant denies that plaintiff played any role either with respect to the 1994 and 1995 offerings or defendant's retention of a manager for those offerings, and moves for summary judgment, pursuant to Fed. R.Civ.P. 56, on the grounds that plaintiff's finder's fee claim is barred by the New York Statute of Frauds and by the doctrine of accord and satisfaction. For the reasons to be discussed, the Court grants defendant's motion for summary judgment based upon the Statute of Frauds and dismisses the action.

### BACKGROUND

Plaintiff Springwell Corporation ("Springwell") is a financial advisory firm based in Manhattan. Roger Vincent ("Vincent") is Springwell's founder and president. Defendant Falcon Drilling Company, Inc. ("Falcon") is a Delaware corporation headquartered in Houston, Texas, that owns, leases and operates a fleet of drilling rigs and provides various services for the oil and gas industry. Steven A. Webster ("Webster") is Falcon's chief executive officer and founder, and William R. Ziegler ("Ziegler") is Falcon's director and legal counsel.

Several key facts in this action are disputed. However, because this is a motion for summary judgment, the Court describes and considers the facts in the light most favorable to plaintiff, the non-moving party. Fed R. Civ. P. 56. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

Ziegler and Vincent were longtime personal friends. In early 1992, as a result of numerous discussions between Ziegler and Vincent, Ziegler orally engaged Springwell to assist Falcon in finding sources of capital. At the time, Falcon was aggressively seeking to expand its operations by acquiring additional rigs and related assets, and was looking for capital to finance these numerous potential acquisitions. Ziegler told Vincent that a successful introduction by Springwell to a source of capital would be "commissionable." Springwell maintains that its finder's agreement with Falcon was open-ended and not limited by time or to a specific project or acquisition.

In subsequent conversations during 1992 and 1993, Ziegler reconfirmed, orally, that Springwell would receive a commission for its services in the event of a successful introduction. Ziegler also sent Vincent confidential information regarding Falcon's business plans to assist Springwell in talking about Falcon to prospective investors.

No written finder's fee agreement was ever entered into by the parties. Vincent did not request any written retention agreement for Springwell's services even though Vincent testified at deposition that, except for Springwell's alleged agreement with Falcon, all other of its finder's fee agreements were in writing. Nevertheless, Springwell claims that no written agreement with Falcon was required because of "common understandings" developed between Ziegler and Vincent in other transactions, "ongoing communications and correspondence" between the parties, and Vincent's reliance on Ziegler's statement that Springwell's services would be commissionable. (Complaint ¶ 43.)

In 1992 and 1993, Springwell contacted numerous potential sources of capital on Fal-

con's behalf. For instance, in 1992, Springwell contacted potential investors about Falcon's "Maraven Project," a joint venture with Maravan S.A. to operate certain drilling rigs in Venezuela. Although Springwell's efforts did not lead to any actual investment in the Maraven Project, Webster, Falcon's CEO, acknowledged Springwell's efforts in a letter in which he thanked Vincent for an introduction to one potential investor.

In early 1993, Springwell endeavored to find capital investors for a second Falcon acquisition initiative, the "Hutchnance Project." Ziegler supplied Vincent with confidential information regarding the Hutchnance Project to aid in Springwell's efforts. Springwell sent a copy of the Hutchnance proposal to, among others, Anthony Lundy ("Lundy"), a vice president at the investment banking firm of Donaldson, Lufkin, & Jenretter ("DLJ"). Springwell then arranged for a meeting between Falcon and DLJ on March 4, 1993. At the meeting, which was attended by Lundy, Ziegler, Webster and Vincent, the parties discussed the Hutchnance Project and Falcon's general business and capital needs. This was Falcon's first introduction to Lundy. The March 4 meeting, however, did not lead to any interest on DLJ's part in Falcon, and the Hutchnance Project was completed in April 1993 without the investment of DLJ.

Springwell maintains that it continued to encourage DLJ's investment in Falcon during subsequent conversations in March, April, and May of 1993. In that regard, Springwell alleges that it arranged a second meeting between the same parties from Falcon and DLJ on May 27, 1993. According to plaintiff, at this meeting Ziegler and Webster gave Lundy a thorough briefing on Falcon's business and succeeded in sparking DLJ's interest in Falcon.[1]

Shortly thereafter, in or about June 1993, Falcon began looking for an underwriter to manage a high yield debt offering for Falcon. Falcon met on its own with Lundy and other DLJ personnel to discuss Falcon's possible engagement of DLJ for this purpose. Falcon also interviewed other investment banking firms that might potentially serve as Falcon's underwriter for the offering. At deposition, Vincent conceded that Falcon at no time asked Springwell to assist in finding an underwriter or to play any role in connection with Falcon's high yield debt offering. Falcon retained DLJ in October 1993 as one of two underwriters to manage the offering, which was successfully marketed in January 1994, resulting in cash proceeds to Falcon of approximately $120 million (the "Initial Note Offering"). DLJ managed a Second Note Offering for Falcon in March 1995 that raised approximately $50 million. Finally, in July 1995, DLJ managed an Initial Common Stock Offering for Falcon that raised approximately $35 million. The Court will collectively refer to the 1994 and 1995 offerings managed by DLJ as "the Note Offerings."

Vincent contacted Ziegler after the Initial Note Offering in January 1994 to discuss Springwell's commission resulting from Falcon's engagement of DLJ as an underwriter. Plaintiff maintains that Ziegler did not dispute Springwell's entitlement to a commission and agreed to speak to Webster on its behalf.[2] Ziegler then recommended that Springwell bill Falcon for its services in the form of an Annual Retainer of $25,000 a year because Ziegler and Webster were concerned that a single, lump-sum payment to plaintiff would create a problem for them with Falcon's majority shareholders. Springwell accordingly sent Falcon an invoice for $25,000 dated June 2, 1994, with the annotation "Financial Advisory Services—Annual Retainer." Webster paid the amount, but crossed out the words "Annual Retainer" on the return copy of the invoice. The return copy of the invoice also bore the handwritten notation by Webster: "Falcon–Def Fin [deferred financing] costs-DLJ." Springwell deposited the $25,000 check. Nine months later, in

---

1. Defendant flatly denies that the May 27, 1993 meeting ever took place.

2. Defendant denies that Ziegler, or anyone else at Falcon, ever conceded Springwell's entitlement to a commission. Rather, defendant contends that Ziegler was outraged by plaintiff's demand for a fee, but undertook to discuss the matter with Webster to see if Falcon could do anything for Springwell in view of its past, albeit unsuccessful, efforts to find investors for Falcon.

March 1995, plaintiff wrote to Falcon to settle its claim for additional fees. When Defendant refused to pay any additional amount, Springwell retained counsel and filed the instant lawsuit.

The complaint, which alleges a single cause of action in quantum meruit, claims that Springwell is entitled to a commission of at least $1 million based upon the three Note Offerings managed by DLJ, pursuant to Springwell's oral agreement with Falcon. Falcon denies that any commission is due and moves for summary judgment on the grounds that (1) plaintiff's claim to a fee based upon the alleged oral agreement is barred by the New York Statute of Frauds, and (2) Springwell's acceptance of the $25,000 payment constitutes accord and satisfaction and precludes the instant claim. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court's role on a motion for summary judgment is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant satisfies its initial burden, the nonmoving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If a court determines that the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Porky Prods. v. Nippon Express U.S.A., Inc.*, 1997 WL 481618, at *2 (S.D.N.Y.1997) (quoting *Matsushita Elec. In-*

*dus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (citations omitted).

### II. The Statute of Frauds

Falcon argues that Springwell's finder's fee claim is barred by the New York Statute of Frauds. N.Y. Gen. Oblig. Law § 5–701(a). The Statute of Frauds provides that:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

... (10)[i]s a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation....

*Id.* at § 5–701(a)(10). The writing required by the Statute must contain all material terms of the agreement. *See Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 575, 245 N.E.2d 712, 715, 297 N.Y.S.2d 947, 953 (1969). Those terms need not be contained in a single document, however. Rather, a sufficient writing under the Statute of Frauds "may be established by a combination of signed and unsigned documents, letters or other writings provided 'at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged (or his authorized agent), while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed.'" *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 379,

300 N.Y.S.2d 817, 822, 248 N.E.2d 576, 579–80 (1969) (quoting *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 57, 110 N.E.2d 551, 555 (1953)).

■ It is well settled that the Statute of Frauds applies to claims for finder's fees. Indeed, in 1964 the New York Legislature amended the Statute, adding the above-quoted definition of "negotiating," specifically to clarify that the Statute covers finder's fee arrangements. In the note accompanying the 1964 amendment, the Law Revision Commission stated that the amendment's purpose was:

> to make clear that the contracts required to be evidenced by writing include a contract or agreement for the compensation of a business broker for acting as a 'finder,' 'originator' or 'introducer,' or for assisting in the negotiation or consummation of the transaction, and that the requirement cannot be avoided by an action for compensation in quantum meruit.

N.Y. Legis. Doc. No., 1964, 65(F). *See also Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521, 525, 277 N.Y.S.2d 268, 270, 223 N.E.2d 793, 795 (1966) (1964 amendment intended "to clearly apply the section to finders"). Thus, in *Minichiello,* where a broker sought a finder's fee in quantum meruit, but had no written memorandum of his alleged contract with the defendants, the Court of Appeals dismissed the action as barred by the Statute of Frauds. *Id.*[3]

Three years later, however, in *Morris Cohon & Co. v. Russell,* the Court of Appeals limited *Minichiello* 's holding "to situations in which there is a complete absence of any memorandum." 23 N.Y.2d 569, 572, 297 N.Y.S.2d 947, 950, 245 N.E.2d 712, 713–14 (1969). In *Morris Cohon,* the plaintiff's quantum meruit claim for a broker's fee relied upon a clause in the written contract of sale between the parties which read:

> The sellers represent and warrant that they have dealt with no person or persons other than Morris Cohon & Co. as broker or finder in connection with the transactions in this agreement, and that all negoti-

ations relative to this agreement have been carried on by them without the intervention of any other broker or finder, and the Sellers agree to indemnify Buyer and the Company and hold them harmless against and in respect of any claim for brokerage or finder's commission relative to this agreement whether by said Morris Cohon & Co. or otherwise.

*Id.,* 23 N.Y.2d at 573, 297 N.Y.S.2d at 950–1, 245 N.E.2d at 714. Finding that this writing identified all essential elements of the brokerage agreement except the amount of compensation to be paid to the broker, the Court held that the plaintiff's claim in quantum meruit for the reasonable value of its brokerage services was not precluded by the Statute of Frauds, even though the writing contained no specific compensation term. *Id.,* 23 N.Y.2d at 574, 297 N.Y.S.2d at 952, 245 N.E.2d at 715. The Court reasoned that the writing did not have to establish the amount of compensation because "reasonable compensation" was implied by law, and, therefore, the Statute of Frauds was satisfied.

In so holding, the Court looked to the intent of the Statute's writing requirement, stating:

> The Statute of Frauds was designed to guard against the peril of perjury; to prevent the enforcement of unfounded fraudulent claims. But, as Professor Williston observed: 'The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly made.' (4 Williston, Contracts (3d ed.), § 567A, pp. 19–20).

*Id.,* 23 N.Y.2d at 574, 297 N.Y.S.2d at 952, 245 N.E.2d at 715. The Court determined that where, as in *Morris Cohon,* the writing relied upon "identifies the parties to the contract, the subject matter of the contract and establishes that plaintiff in fact performed

---

**3.** The Court of Appeals held in *Minichiello* that, even prior to the 1964 clarifying amendment, the Statute of Frauds as originally drafted in 1949

precluded quantum meruit claims for finder's fees absent a writing. *Id.,* 18 N.Y.2d at 527, 277 N.Y.S.2d at 272, 223 N.E.2d at 796.

... the peril of perjury is largely, if not entirely, absent." *Id.*

The Court further stated:

We specifically note that in reaching this conclusion we do no violence to the well-established rule that in a contract action a memorandum · sufficient to meet the requirements of the Statute of Frauds must contain expressly or by reasonable implication all the material terms of the agreement, including the rate of compensation if there has been agreement on that matter.... In an action in quantum meruit, however, for the reasonable value of brokerage services, if it does not appear that there has been an agreement on the rate of compensation, a sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged services. The obligation of the defendant to pay reasonable compensation for the services is then implied.

*Id.*, 23 N.Y.2d at 575–76, 297 N.Y.S.2d at 953, 245 N.E.2d at 715–16 (citations omitted).

Finally, the *Morris Cohon* Court concluded by emphasizing that the writing relied upon in that case was sufficient to support a quantum meruit claim under the Statute of Frauds because "[i]t identifies the buyer, it identifies the defendant as one of the sellers, it establishes the fact of plaintiff's employment, it identifies the plaintiff as the broker, it establishes the subject matter of the transaction and, most important, it acknowledges performance by the plaintiff in bringing about the sale of defendant's stock." *Id.*, 23 N.Y.2d at 576, 297 N.Y.S.2d at 953, 245 N.E.2d at 716.

The *Morris Cohon* decision concededly leaves some ambiguity as to whether, to sustain a quantum meruit action, the writing relied upon must contain all essential terms of the contract but the rate of compensation, whether it must further contain an acknowledgment by the defendant of the plaintiff's performance, or whether it need only "evidence that fact of plaintiff's employment by defendant to render the alleged services." 23 N.Y.2d at 575–76, 297 N.Y.S.2d at 953, 245 N.E.2d at 715–16. This question has not been squarely resolved. However, a review of the cases applying *Morris Cohon* indicates

that courts have, at a minimum, required the writing relied upon to establish clearly the existence of the alleged finder's agreement and its subject matter. While written acknowledgment by the defendant of the plaintiff's performance has been found to be persuasive evidence of an agreement's existence, courts have not uniformly required it. *See Flammia v. Mite Corp.*, 401 F.Supp. 1121, 1133 (E.D.N.Y.1975) (quantum meruit claim satisfied Statute of Frauds where writings "sufficiently identif[ied] seller, identif[ied] and establish[ed] plaintiff's role in the negotiations, establish[ed] the subject matter of the transaction; and most, important, acknowledge[d] performance by and obligation to the plaintiff as a consequence of his assistance"); *Blye v. Colonial Corp. of America*, 102 A.D.2d 297, 299, 476 N.Y.S.2d 874, 875 (1st Dep't 1984) (quantum meruit claim permitted where "[e]xcept for the absence of a firm agreement as to the amount of plaintiffs' compensation, the letter adequately sets forth the terms of the contract claimed by plaintiffs"); *Shapiro v. Dictaphone Corp.*, 66 A.D.2d 882, 884–85, 411 N.Y.S.2d 669, 672–73 (2d Dep't 1978) (quantum meruit claim not barred where writings evidenced the agreement's "subject matter, plaintiff's role, and the fact that the plaintiff's services were never intended to be gratuitously furnished," as well as defendant's acknowledgment of plaintiff's performance); *Kalfin v. United States Olympic Comm.*, 209 A.D.2d 279, 281, 618 N.Y.S.2d 724, 725 (1st Dep't 1994) (letters in which defendant acknowledged obligation to compensate plaintiff for his role in bringing about transaction satisfied Statute of Frauds for purposes of quantum meruit claim); *Peters v. Sigma Data Computing Corp.*, 397 F.Supp. 1098, 1101 (E.D.N.Y.1975) (quantum meruit action not precluded by Statute of Frauds where letter agreement identified seller, established the fact of plaintiff's employment, identified the plaintiff as the exclusive finder, and where plaintiff's performance was not disputed).

On the other hand, courts have dismissed quantum meruit claims under the Statute of Frauds where the writings relied upon failed to establish that the defendant actually agreed to pay a finder's fee, or where the

writings left ambiguity as to whether the agreement's terms covered the transaction upon which a fee was claimed. *See R.B. Hamilton & Assocs. v. Gibbons Green and van Amerongen, Ltd.*, 169 A.D.2d 554, 564 N.Y.S.2d 733 (1st Dep't 1991) (dismissing finder's fee claim where each of the writings relied upon by plaintiff "is limited to specific transactions expressly referred to therein, and not the particular transaction for which plaintiff now seeks a fee"); *Klein v. Smigel*, 44 A.D.2d 248, 354 N.Y.S.2d 117 (1st Dep't 1974) (dismissing quantum meruit claim where only writing negated defendant's intention to pay a finder's fee); *Karlin v. Avis*, 457 F.2d 57, 61 (2d Cir.1972) (dismissing quantum meruit claim where writings failed to evince that defendant agreed to be bound by alleged agreement and where documents relied upon were not prepared or signed by defendant); *Merex A.G. v. Fairchild Weston Systems, Inc.*, 810 F.Supp. 1356, 1367 (S.D.N.Y.1993) (dismissing quantum meruit where writings failed to evidence the alleged terms of the oral contract). *See also Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 379, 300 N.Y.S.2d 817, 822–23, 248 N.E.2d 576, 579–80 (1969) (dismissing finder's contract claim under Statute of Frauds where writing did not specifically cover the acquisition that ultimately took place).

The question here is whether the writings relied upon by plaintiff establish an agreement by Falcon to pay Springwell a commission for the identification of an underwriter in connection with the 1994 and 1995 Note Offerings. I conclude they do not.

### A. *The Writings Relied on by Springwell*

█ Springwell relies upon twelve documents written over the course of four years as the basis for its claim that Falcon must pay a finder's fee based upon Falcon's engagement of DLJ to manage its Note Offerings. The writings, which the Court has numbered for reference, are described here in relevant part:

1. January 3, 1992 letter from Ziegler to Vincent stating that "Falcon is beginning the process of locating institutional investors, such as insurance companies and pension plans, for our next round of equity financing... I was hopeful that you might have some ideas as to who Falcon could approach with an investment opportunity of this kind.... Please let me know if you have any ideas as to who would have an interest in looking further at this. The Company is now just beginning the process of contacting potential investors and Steve Webster or I would be happy to set up a meeting. In addition to the enclosed private placement memorandum, a copy of Falcon's business plan is also enclosed."

2. February 6, 1992 letter from Ziegler to Vincent, enclosing "copies of additional materials concerning Falcon which ... are obviously confidential and should not be given out to any third parties, but are for your information in talking to prospective investors for our equity offering."

3, 4. Two internal Falcon documents entitled "List Of Prospective Investors" (undated) and "Falcon Prospective Investor List" (dated March 14, 1992) which list Vincent as a "Finder" and "Initiator," respectively, with respect to certain potential investors (none of them DLJ). Neither document is signed.

5. June 29, 1992 letter from Webster to Vincent, thanking him for an introduction to a potential investor (not DLJ), and stating: "We would appreciate any other ideas you might have concerning potential investors for Falcon."

6. September 29, 1992 letter from Ziegler to Webster and Vincent providing update on the Maraven Project and stating that Vincent would "check on" the prospect of Bankers Trust's involvement in the project.

7. February 24, 1993 letter from Vincent to Lundy (DLJ) and copied to Falcon. "The purpose of this letter is to introduce you to a small financing Springwell is handling for one of

its energy clients." The letter describes Falcon's interest in finding debt and equity investors to finance Falcon's acquisition of the jackup drilling rig business of the Hutchnance Division of Grace Offshore (the Hutchnance Project).

8. April 22, 1993 letter from Ziegler to Vincent regarding earlier "discussions concerning a refinancing of Falcon's indebtedness and/or a Venezuelan credit facility." The letter lists eighteen banks Falcon would consider as possible finance sources. (DLJ is not on the list.)

9. June 2, 1994 invoice from Springwell to Falcon for $25,000. The words "Annual Retainer" have been crossed out in pen (by Webster) so that the only words describing the purpose of the invoice are "1993 Financial advisory services." There is also a handwritten notation reading "Def Fin Costs–DLJ."

10. April 13, 1995 letter of recommendation from Webster to Lundy (DLJ) on behalf of Vincent's son, Roger Jr. "As you know, Roger [Vincent] Sr., has been a good friend to our company over the years and, in particular, in helping with the DLJ business. I would consider it important to Falcon's relationship with DLJ if your firm could find a trainee position for Roger Jr."

11. September 18, 1995 letter from Ziegler to Vincent in light of "the implicit threat of litigation." There are several important things that I think I need to clarify at the outset. As you know, Falcon has, from its very inception, been reaching out for sources of debt and equity capital. . . . When new investors were introduced through brokers or finders, these individuals were compensated very generously by the Company in terms of fees for funds secured. Offhand, I can think of a half dozen situations where fairly hefty fees were paid whether or not there was a written agreement between the Company and the finder. . . .

The Company's situation did change at about the time . . . Falcon began to explore the public markets from its securities through major underwriters. My recollection of this process was that Steve Webster began contacting underwriters to select a house that could either take the Company's common stock public or access the high yield debt market. Because of his Wall Street background, Steve for years has had excellent contacts with all the major houses, including DLJ. . . .

I remember our conversation about your contact at DLJ and your suggestion that you set up a meeting between Steve and DLJ. I recall at the time that I said "Fine, go ahead" to set up a meeting and that I had mentioned this to Steve. . . . The subject of a commission from Falcon for an introduction to an underwriter was not discussed with you or Steve.

The process of selecting an underwriter went on for some weeks. . . . Unlike the years of raising capital from investors, the underwriters were aggressively touting their wares to Falcon. There were positives and negatives with all the leading candidates with respect to Falcon—DLJ I think had a little edge overall because Steve Webster liked Tony Lundy and was impressed with Tony's grasp from an intellectual standpoint of what Falcon was all about. I am assuming that your conversations with Tony probably prepped Tony better than some of the competition on the Company. In any event, . . . Falcon eventually went with DLJ and Kidder for its initial high yield debt offering. . . . What I hope this makes clear is that unlike the experience of trying to introduce investors to Falcon, the Company was in a seller's market and was hiring a banking house which would be paid a fee as an agent to place its notes or its shares *with other investors* . . . . [emphasis in original]

As to the $25,000 fee you were paid by Falcon for the introduction, ... I hoped that whatever shortfall you felt existed could be made up over time by creating a continuing relationship—hence the suggestion about billing the $25,000 as an annual fee, an idea that the Company rejected.

12. March 27, 1996 letter from Webster to Vincent. "I understand that you plan to take legal action against Falcon based on your not being paid a more generous finders [sic] fee for introducing DLJ to Falcon.... I was never made aware by you before the meeting took place your introduction of Tony Lundy to Falcon had attached to it any kind of fee arrangement.... To my knowledge, you spent little or no time with Lundy on Falcon's behalf beyond the initial meeting. If you did, you were not asked by me or authorized to do so... Falcon paid you a $25,000 finders fee which I feel was more than generous, particularly since it was put to me after the fact.... From 1975–1978, I worked at the same firm with three senior level bankers at DLJ.... I needed no introduction to DLJ if there was a finders fee to be involved. This introduction was more for Lundy's benefit than mine."

## B. *Analysis of Writings Relied Upon*

What is most immediately striking about the twelve documents relied upon by plaintiff is that not a single one of them authorizes Springwell to find an underwriter for Falcon. Not a single one of them explicitly engages Springwell's assistance with respect to the Note Offerings, or acknowledges that Springwell played any role or performed any service with respect to the Note Offerings. Indeed, with the exception of Ziegler's September 1995 letter and Webster's March 1996 letter (Documents 11 and 12)—both written *after* the Note Offerings occurred and in response to plaintiff's pre-litigation demands—none of the documents relied upon even mention the 1994 and 1995 Note Offerings.

Plaintiff contends it nevertheless is entitled to a commission based on DLJ's management of these transactions because Springwell's finder's fee agreement with Falcon to locate sources of capital "was of an ongoing nature and was never limited to a particular Falcon project or to a particular source of capital." (Pl.'s Brief at 24.) No matter what the parties may have agreed to orally, however, the writings upon which Springwell relies, even when read together, do not establish the open-ended, limitless agreement that is alleged. At best, these writings reflect Springwell's employment by Falcon to find investors for particular Falcon offerings, all of which were different from and predated the Note Offerings upon which plaintiff now seeks a commission. Moreover, nothing in the documents indicates that the scope of Springwell's alleged finder's agreement extended beyond the identification of potential investors to encompass the identification of potential underwriters.

Document 1, the January 3, 1992 letter from Ziegler to Vincent, requests Springwell's assistance in locating "institutional investors, such as insurance companies and pension plans for [Falcon's] next round of equity financing," and encloses a copy of Falcon's private placement memorandum for that purpose. It speaks neither of an open-ended finder's fee agreement, nor of Springwell's engagement for any purpose other than to find investors for the 1992 equity offering in question. Document 2 merely encloses additional materials in furtherance of the equity offering referenced in Document 1. While Documents 3 and 4 list Vincent as a "finder" and "initiator" with respect to three potential investors (none of them DLJ), these internal, unsigned memoranda do not reference the 1994 and 1995 Note Offerings and offer no support for the claim that Springwell's agreement with Falcon was limitless. Furthermore, Documents 3 and 4, from their titles, concern "Prospective Investors," not prospective underwriters. Document 5, a 1992 letter from Webster to Vincent stating "we would appreciate any other ideas you might have concerning potential

investors for Falcon," comes closer to reflecting an ongoing finder's relationship between the parties, but, again, only for the purpose of locating "potential investors," not underwriters. Nor does the mere invitation of plaintiff's "ideas" establish an intent by Falcon to bind itself to pay a commission to Springwell based upon any transaction that might transpire at a future date. *See Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784 (2d Cir.1986) ("invitational language" requesting facts and information regarding potential acquisition did not establish promise to pay a finder's fee and thus was insufficient to satisfy Statute of Frauds). Document 6 is limited on its face to the Maravan Project. Document 7, a letter from Springwell to DLJ, concerns only DLJ's possible investment in the Hutchnance Project, and cannot be read to reflect Springwell's engagement by Falcon to approach DLJ for any other purpose. Finally, while it is not clear what Document 8 concerns, it certainly does not authorize Springwell to perform any services in connection with finding an underwriter for Falcon's Note Offerings. In short, none of the writings relied upon which predate the 1994 and 1995 Note Offerings "evidence the fact of plaintiff's employment by defendant" to find an underwriter to manage Falcon's Note Offerings, or to render any services in connection with the Note Offerings. *Morris Cohon,* 23 N.Y.2d at 575–76, 297 N.Y.S.2d at 953, 245 N.E.2d at 715.

█ Springwell's reliance upon *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953) for the proposition that these writings can be pieced together to create an agreement broader than what is stated in the writings themselves is also misplaced. Writings can be read together to satisfy the Statute of Frauds "provided that they clearly refer to the same subject matter or transaction." *Crabtree,* 305 N.Y. at 55, 110 N.E.2d at 554. The writings relied upon

by Springwell do not relate to the same subject matter or transaction. Rather, they refer to several discrete transactions, none related to the transactions at issue in the litigation. While oral testimony may be admissible to show a connection between a signed writing and an unsigned writing related to the same transaction, such testimony cannot be used to create an agreement not found in the writings. *See Scheck v. Francis,* 26 N.Y.2d 466, 470–72, 311 N.Y.S.2d 841, 843–45, 260 N.E.2d 493, 494–96 (1970). *See also Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 11 (2d Cir.1989) ("Parol evidence ... is immaterial to the threshold issue whether the documents are sufficient on their face to satisfy the Statute of Frauds.... That issue must be determined from the documents themselves, as a matter of law.") (quoting *Bazak Int'l Corp. v. Mast Indus., Inc.,* 73 N.Y.2d 113, 118, 538 N.Y.S.2d 503, 505, 535 N.E.2d 633, 635 (1989)). Here, the writings do not collectively, on their face, establish a finder's agreement for the transactions upon which a $1 million commission is now sought.[4]

Springwell also relies upon Documents 9 through 12 in an attempt to show that, after the Note Offerings occurred, Falcon admitted that plaintiff was entitled to a fee in connection with Falcon's engagement of DLJ as an underwriter. However, these writings do not achieve the purpose for which they are offered. While Ziegler's and Webster's letters to Vincent (Documents 11 and 12) may acknowledge that Springwell's "prepping" of Lundy helped DLJ become Falcon's underwriter, these letters emphatically deny that Falcon ever agreed to pay Springwell a commission in connection with Falcon's retention of an underwriter. *See Klein v. Smigel,* 44 A.D.2d 248, 354 N.Y.S.2d 117 (1st Dep't 1974) (dismissing quantum meruit claim under Statute of Frauds where only

---

4. Plaintiff makes much of the fact that some of the proceeds from the Note Offerings were applied to acquire assets and pay down debts related to the Maravan and Hutchnance Projects. Even if true, this is irrelevant. Nothing in the law requires a defendant to pay a commission on a transaction for which there was no finder's agreement simply because it bears some connection to an earlier, substantially different transaction for which there was an agreement. *See Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 379, 300 N.Y.S.2d 817, 822–23, 248 N.E.2d 576, 579–80 (1969) (dismissing finder's claim under Statute of Frauds were writing did not specifically cover the acquisition that ultimately took place, even though the same or similar assets were at stake).

writing negates any expression of an intention to pay a finder's fee).

Plaintiff also relies on Webster's letter to DLJ recommending Vincent's son for a job, in which Webster states that Vincent has been a "good friend" and "in particular, in helping with the DLJ business" (Document 10). However, this casual statement, written for the evident purpose of procuring a job for Vincent's son at DLJ, is not the type of admission of performance contemplated by *Morris Cohen.* In *Morris Cohon,* the contract clause deemed to be an admission stated that the defendant had dealt "with no person or persons other than Morris Cohon & Co. as broker or finder in connection with the transactions in this agreement." *Id.* at 573, 245 N.E.2d at 714, 297 N.Y.S.2d at 950. By contrast, Webster's letter to DLJ does not even mention the transactions upon which a fee is claimed.

Finally, Springwell relies on the $25,000 Springwell invoice bearing the notation "Def Fin Costs–DLJ" (Document 9). According to plaintiff, this writing reflects Falcon's partial payment of a commission specifically in connection with "DLJ," and therefore constitutes an admission that Falcon owed Springwell a finder's fee for its introduction of Falcon to DLJ. I disagree. Falcon could have paid Springwell $25,000 for any number of reasons: to avoid litigation, in the hopes of maintaining personal and professional relations with Springwell, to thank Springwell for its past, albeit unsuccessful efforts to recruit DLJ for the Hutchnance Project, or, as plaintiff contends, because Falcon felt legally obligated to do so. While plaintiff is entitled to have this Court draw all reasonable inferences in its favor from the documents it relies upon, this Court cannot, under the Statute of Frauds, find an enforceable finder's fee agreement unless the existence of that agreement is clearly discernable from the writings. Here, the simple notation "Def Fin Costs—DLJ" does not provide a sufficient basis for divining a legally enforceable finder's fee agreement. *See Merex A.G. v. Fairchild Weston Systems, Inc.,* 810 F.Supp. 1356, 1367 (S.D.N.Y.1993) (defendant's internal file reference to "commission to Merex" was insufficient to establish defendant's in-

tent "to authenticate such statement as a contractual commitment to pay a commission to Merex"). Even if the "DLJ" notation in Document 9 is read together with the eleven other documents relied upon by plaintiff, the collective writings simply do not evidence that Falcon retained Springwell to find an underwriter or agreed to pay a fee for anything other than Springwell's identification of capital investors for transactions predating the Note Offerings.

Springwell insists that in *Davis & Mamber, Ltd. v. Adrienne Vittadini, Inc.,* 212 A.D.2d 424, 622 N.Y.S.2d 706 (1st Dep't 1995), the plaintiff's quantum meruit claim survived dismissal under the Statute of Frauds "with less extensive writings than are in the record here." (Pl. Br. at 20.) In *Davis & Mamber,* the plaintiff premised its claim upon a letter written by the defendants that specifically authorized the plaintiff to approach a certain manufacturer about entering into a licensing agreement with defendants. The plaintiff set up meetings to introduce the defendants to the manufacturer and, three years later, the parties entered into a licensing agreement. Although the letter relied upon by the plaintiff did not mention a finder's fee, the Court found that it satisfied the Statute of Frauds for purposes of bringing a quantum meruit claim because the letter, written and signed by the defendants, evidenced the fact of plaintiff's employment by the defendants for the specific purpose of procuring a licensing agreement with the manufacturer, and that purpose was achieved. In contrast, the documents relied upon by Springwell in the instant case do not establish that Falcon authorized Springwell to approach DLJ for any purpose other than to solicit DLJ's involvement in Falcon as a capital investor. *Davis & Mamber* is therefore eminently distinguishable. Nothing in the law entitles Springwell to a fee because Falcon later happened to select an underwriter for the Note Offerings which Springwell had earlier approached for a different purpose.

Springwell's appeal to the holding of *Blye v. Colonial Corp. of America,* 102 A.D.2d 297, 476 N.Y.S.2d 874 (1st Dep't 1984) is similarly misplaced. There, the Court per-

mitted the plaintiffs' quantum meruit action for a brokerage fee based upon a letter by the defendant that (i) described the plaintiffs' and defendant's joint strategy for negotiating a licensing agreement with a target manufacturer, and (2) cited two methods in which the plaintiffs' commission could be calculated based upon the transaction as "an area for future discussion." *Id.*, 102 A.D.2d at 298, 476 N.Y.S.2d at 875. Unlike the instant case, the specific transaction for which the plaintiffs' services were sought in *Blye* was clearly identified in a writing, and the same writing acknowledged defendant's belief that plaintiffs should be compensated for those services. *Blye* does not lend support to Springwell's case here, where none of the documents relied upon so much as mentions Falcon's engagement of Springwell to find an underwriter (except to deny that fact).

In sum, I find that Springwell's finder's fee claim is precluded by the Statute of Frauds for lack of a sufficient writing. Any other conclusion would contravene the Statute's strong intent "to guard against peril of perjury" and "to prevent the enforcement of unfounded fraudulent claims." *Morris Cohon*, 23 N.Y.2d at 574, 297 N.Y.S.2d at 952, 245 N.E.2d at 715. *See also R.B. Hamilton*, 169 A.D.2d 554, 564 N.Y.S.2d 733 (1st Dep't 1991) (Statute of Frauds serves "New York's paramount interest in protecting against unfounded claims, and the possibility of erroneous verdicts."). In the instant case, the peril of perjury is significant given that the parties disagree on key factual issues of the dispute: Springwell contends its finder's agreement with Falcon was open-ended; Falcon contends that any agreement at most covered specific projects in 1992 and 1993. Springwell claims that it arranged and hosted a March 27, 1993 meeting between DLJ and Falcon that led directly to DLJ's interest in managing Falcon's Note Offerings; Falcon denies such a meeting ever took place. Springwell claims that Ziegler admitted to Vincent that Springwell was owed a commission for the DLJ introduction; Falcon adamantly denies that contention and maintains that Ziegler was outraged by the request. All of these issues would have to be decided by a jury if the case went to trial, creating the very risk of an erroneous outcome that the Statute of Frauds is intended to prevent.

In granting summary judgment for the defendant, this Court is also mindful that Vincent, Springwell's president, apparently understood the risks of doing business absent a written agreement because, as he admitted at deposition, all of Springwell's finder's agreements, except for this one, were in writing. A writing likewise could have been easily obtained in this case. *See Freedman v. Chemical Construction Corp.*, 43 N.Y.2d 260, 267, 401 N.Y.S.2d 176, 180, 372 N.E.2d 12, 17 (1977) (an "alleged agreement, ... in the absence of a writing, so easily obtained in a proper case, is unenforceable").

Because defendant is entitled to summary judgment based upon the Statute of Frauds, the Court need not address defendant's defense of accord and satisfaction.

### CONCLUSION

For the reasons discussed above, this Court grants summary judgment to the defendant. In light of this holding, the Court also dismisses as moot the defendant's objections to the decision of Magistrate Judge Buchwald, concerning discovery-related matters. The Clerk of the Court is hereby directed to dismiss the action.

### MEMORANDUM OPINION AND ORDER

SOTOMAYOR, J.

In May 1998, this Court granted summary judgment in favor of defendant Falcon Drilling Company, Inc. ("Falcon") under the Statute of Frauds. Plaintiff Springwell Corporation ("Springwell") thereafter moved for reconsideration, based upon written evidence not considered by the Court at the time of its ruling. On July 1, 1998, I granted Springwell's motion for reconsideration and directed the parties to submit additional briefs addressing how the evidence not theretofore considered by the Court impacted the Court's analysis in its original grant of summary judgment. *See Springwell Corp. v. Falcon Drilling Co., Inc.*, 1998 WL 352533 (S.D.N.Y. Jul.1, 1998). For the reasons to be discussed, I now deny defendant's

motion for summary judgment based upon the new evidence.

## BACKGROUND

The facts of this case are fully set forth in the Court's earlier decision granting summary judgment. *See Springwell Corp. v. Falcon Drilling Co., Inc.,* 1998 WL 230989 (S.D.N.Y. May 4, 1998). Familiarity with that Opinion is assumed. However, the following is a summary of the pertinent facts.

Springwell brings this action in quantum meruit, claiming that pursuant to an oral agreement with Falcon, it is owed a commission for introducing Falcon to Donaldson, Lufkin, & Jenretter ("DLJ"), an investment banking firm that Falcon retained to underwrite certain debt and equity offerings made by Falcon in 1994 and 1995 ("the 1994 and 1995 Note Offerings"). According to Springwell, William Ziegler, a Falcon director and legal counsel, orally retained Springwell's services in or about 1992, representing that Springwell would be paid a commission if it successfully introduced Falcon to any sources of capital. Springwell claims the agreement with Falcon was broad and open-ended, not limited to any specific transaction or time-period, or to any type or source of capital. The parties did not, however, reduce the alleged agreement to writing, even though Springwell's president, Roger Vincent, testified at deposition that it was Springwell's regular practice to memorialize finder's fee agreements in writing.

Springwell claims that relying upon the oral agreement and Ziegler's continued representations that a successful introduction would be commissionable, in March 1993, it arranged a meeting to introduce Falcon to DLJ and, in particular, to Anthony Lundy, DLJ's vice president, whose expertise lay in assisting oil and gas companies like Falcon. The meeting was attended by Vincent, Lundy, Ziegler, and Steven Webster, Falcon's CEO. Springwell maintains that following that meeting, it engaged in various follow-up efforts aimed at sparking DLJ's interest in Falcon. According to Springwell, as the direct result of these efforts, Webster and Lundy entered into negotiations that culminated in Falcon's retention of DLJ in Octo-

ber 1993 as an underwriter for Falcon's 1994 and 1995 Note Offerings. The first offering managed by DLJ in January 1994, raised approximately $120 million for Falcon. The two subsequent offerings managed by DLJ in March and July 1995, raised an additional $85 million. Springwell claims that it is entitled to a commission based upon each of these three transactions.

Falcon denies that it owes any commission to Springwell. While Falcon concedes that Springwell arranged the March 1993 meeting between Falcon and DLJ, and that Webster had not previously met Lundy, Falcon maintains that the meeting related to a different transaction in which DLJ did not become involved, and had nothing to do with the 1994 and 1995 Note Offerings upon which Springwell now seeks a commission. Furthermore, Falcon maintains that any finder's fee agreement it may have had with Springwell was not open-ended and related only to the finding of investors, not underwriters. Finally, Falcon contends that Springwell provided no services in connection with the 1994 and 1995 Note Offerings.

After the conclusion of discovery in this action, Falcon moved for summary judgment on the grounds that Springwell's finder's fee claim based upon the 1994 and 1995 Note Offerings was barred by the New York Statute of Frauds and by the doctrine of accord and satisfaction. I granted the motion based upon the Statute of Frauds, finding that Springwell had failed to produce any writing, or collection of writings, evidencing Falcon's employment of Springwell's services in connection with the 1994 and 1995 Note Offerings.

Following that decision, however, Springwell moved for reconsideration on the ground that in reaching its decision, the Court had not considered a letter from William Ziegler to Steven Webster dated April 8, 1994 (the "Ziegler letter"). Falcon had withheld the Ziegler letter from production on grounds of privilege, even after Magistrate Judge Buchwald ordered it disclosed upon finding that the letter was not in fact privileged. In her ruling, Magistrate Buchwald found that even though Ziegler was Falcon's legal counsel when the Ziegler letter was written, Ziegler's

role with respect to Springwell on behalf of Falcon was that of a business advisor, not an attorney, and furthermore, that the communications contained in the April 4, 1994 letter did not reflect legal advice. (*See* Ex. 1 to Pl.'s Mem. in Support of Motion for Reconsideration.) Falcon objected to the Magistrate's ruling, and was still withholding the Ziegler letter from Springwell when this Court ruled upon Falcon's summary judgment motion.

After reviewing the Ziegler letter *in camera*, I agreed with plaintiff that the letter was relevant to the issues in the summary judgment motion and should have been considered. *See Springwell Corp. v. Falcon Drilling Co., Inc.*, 1998 WL 352533 (S.D.N.Y. Jul.1, 1998). I also affirmed Magistrate Buchwald's determination that the Ziegler letter was not privileged, finding Falcon's objections to be without merit, and I ordered Falcon to produce it. *Id.* Granting Springwell's motion for reconsideration, I then directed the parties to submit supplemental briefs addressing how, if at all, the Ziegler letter impacted the Court's prior grant of summary judgment under the Statute of Frauds.

The Ziegler letter states in its entirety:

Re: *Falcon Senior Note Offering*

Dear Steve [Webster]:

I have had several conversations with Roger Vincent concerning his retainer in connection with financial services rendered to Falcon. As you are aware, Roger, at our request, introduced Falcon to Tony Lundy of DLJ and performed various liaison services with DLJ thereafter.

I don't think there is any question that a finder's fee or an introduction fee based on a $120,000,000 financing might be significant. However, I don't think Roger is looking for anything unreasonable and has, at his suggestion, volunteered to be compensated on a retainer for which he would be willing to render future services which would also be covered by any amount paid with respect to the introduction.

Please call to discuss.

Very truly yours,

William R. Ziegler [1]

## DISCUSSION

As I stated in my earlier opinion, it is well settled that the New York Statute of Frauds requires contracts for finder's fees to be in writing, *see* N.Y. Gen. Oblig. Law § 5–701(a), and that to satisfy the Statute, a writing or collection of writings must reflect all material terms of the agreement. *See Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 379, 300 N.Y.S.2d 817, 822, 248 N.E.2d 576, 579 (1969).[2] Nevertheless, the New York Court of Appeals had held that even if a finder is unable to recover on a contract claim by virtue of the Statute of Frauds, under some circumstances the finder may still recover in quantum meruit for the reasonable value of the services rendered. *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 575–76, 297 N.Y.S.2d 947, 953, 245 N.E.2d 712, 715–716 (1969). Specifically, *Morris Cohon* permitted a broker to recover compensation in quantum meruit where the writing relied upon identified all material

1. The copy of the Ziegler letter submitted to the Court does not bear Ziegler's signature, although his name is typewritten, and does not appear on professional letterhead. The copy appears to have been generated from a computer file. Given that Falcon has not represented otherwise, the Court assumes for purposes of this motion that the original Ziegler letter was in fact signed by Ziegler and delivered to Webster in the ordinary course.

2. N.Y. Gen. Oblig. Law § 5–701(a) provides that:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the

party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: ... (10)[i]s a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation....

terms of the brokerage agreement except the rate of compensation. *Id.* "In an action in quantum meruit," the Court stated, "if it does not appear that there has been an agreement on the rate of compensation, a sufficient memorandum [to satisfy the Statute of Frauds] need only evidence the fact of plaintiff's employment by defendant to render the alleged services." *Id.* Accordingly, the Court found that the memorandum in *Morris Cohon* was clearly sufficient to sustain a quantum meruit claim because "[i]t identifies the buyer, it identifies the defendant as one of the sellers, it establishes the fact of plaintiff's employment, it identifies the plaintiff as the broker, it establishes the subject matter of the transaction and, most important, it acknowledges performance by the plaintiff in bringing about the sale of defendant's stock." *Id.*, 23 N.Y.2d at 576, 297 N.Y.S.2d at 953, 245 N.E.2d at 716.

In the years since it was decided, *Morris Cohon* has generated differing views as to what constitutes a "sufficient memorandum" under the Statute of Frauds for purposes of maintaining a quantum meruit action. Under the strict reading of *Morris Cohon* adhered to by some courts, a quantum meruit action may proceed only when a writing reflects all material terms of the finder's fee agreement but the rate of compensation. *See, e.g., Newman v. Crazy Eddie, Inc.,* 119 A.D.2d 738, 738–39, 501 N.Y.S.2d 398, 398 (2d Dep't 1986) (quantum meruit action can be maintained only where there exists "a sufficient written memorandum of the agreement, which simply omits to specify the rate of compensation to be paid to the plaintiff"); *Georgiadis v. First Boston Corp.,* 1993 WL 22122, at * 9 (S.D.N.Y. Jan. 26, 1993) ("[i]f essential terms other than compensation are not set for[th] in the relevant writings, . . . no claim for quantum meruit may be sustained").

Most courts, however, have read *Morris Cohon* more expansively. Seizing upon the Court of Appeals' statement that "a sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged services," courts have permitted quantum meruit claims to proceed even if the writing relied upon does not reflect all material terms of the parties' agreement, so long as the writing evidences the defendant's engagement of the plaintiff's services in connection with a transaction that was later brought to fruition. Thus, in *Davis & Mamber, Ltd. v. Adrienne Vittadini, Inc.,* 212 A.D.2d 424, 424–26, 622 N.Y.S.2d 706, 707–08 (1st Dep't 1995), although the writings relied upon by the plaintiff reflected "neither the material terms of any agreement nor, clearly, a rate of compensation," the Court permitted the plaintiff's quantum meruit claim to proceed to trial based upon written evidence that the defendant had authorized the plaintiff to approach a company on its behalf, that the plaintiff did so, that the defendant subsequently entered into a deal with that company, and that the plaintiff's services were not likely to have been rendered gratuitously. *See also Shapiro v. Dictaphone Corp.,* 66 A.D.2d 882, 885, 411 N.Y.S.2d 669, 673 (2d Dep't 1978) (to sustain quantum meruit claim, "[t]he writings need not evidence an actual intention to pay. It is sufficient if the evidence demonstrates that services were requested and the parties reasonably expected that such services were not to be performed gratuitously"); *Perfect Trading Co., Inc. v. Goldman, Sachs & Co.,* 236 A.D.2d 221, 222, 653 N.Y.S.2d 116, 116 (1st Dep't 1997) (dismissing contract claim, but permitting quantum meruit claim, where writings "did not provide the material terms of the contract related to the compensation and duration," but reflected defendants' acceptance of and benefit from the plaintiff's services); *Khazzam v. Tremont Advisers, Inc.,* 214 A.D.2d 515, 517–518, 626 N.Y.S.2d 66, 68 (1st Dep't 1995) (quantum meruit claim allowed to proceed to trial where defendant's writings acknowledged that plaintiff had performed services, but left open "issues of fact . . . with regard to material terms of the agreement and as to whether there was a meeting of the minds to formulate a valid contract"); *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 116 (2d Cir.1985) ("even if [plaintiff] were unable to recover on his contract claim by virtue of the Statute of Frauds, under New York law, the general rule is that where an express contract is unenforceable by reason of the Statute of Frauds, there may still be recovery of the reasonable value of the services

rendered") (internal quotations and citations to New York law omitted).

Of course, the danger in reading *Morris Cohon* too expansively is that the fewer the material terms reflected in writing, the greater the risk that juries will erroneously award a plaintiff compensation based upon an unfounded claim or perjurious testimony. It was this very risk against which the Statute of Frauds was designed to guard. *See Morris Cohon*, 23 N.Y.2d at 574, 297 N.Y.S.2d at 952, 245 N.E.2d at 715. On the other hand, where the fact of employment is established and a plaintiff seeks only the reasonable value of the services provided, *Morris Cohon* clearly maintains that is improper to read the writings too strictly because: "The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made." *Id.* (quoting 4 Williston, Contracts (3d ed.), § 567A, pp. 19–20).

In light of this inherent tension in the Statute of Frauds, courts have been particularly willing to entertain quantum meruit claims where despite its other shortcomings or ambiguities, a defendant's writing expressly acknowledges that the plaintiff performed requested services. *See, e.g., Morris Cohon*, 23 N.Y.2d at 576, 297 N.Y.S.2d at 953, 245 N.E.2d at 716 (defendant's written acknowledgment of plaintiff's performance in bringing about stock transaction was the "most important" basis for permitting recovery in quantum meruit); *Kalfin v. United States Olympic Comm.*, 209 A.D.2d 279, 281, 618 N.Y.S.2d 724, 725 (1st Dep't 1994) (letters in which defendant acknowledged obligation to compensate plaintiff for his involvement in bringing about the agreement between defendant and third party satisfied the Statute of Frauds for purposes of maintaining quantum meruit claim). *Cf. Matisoff v. Dobi*, 90 N.Y.2d 127, 134, 659 N.Y.S.2d 209, 213, 681 N.E.2d 376, 380 (1997) ("oral agreements that violate the Statute of Frauds are nonetheless enforceable where the party to be charged admits having en-

tered into the contract") (citing *Morris Cohon* ). As *Morris Cohon* stated, where a defendant's written statement admits that the plaintiff performed services requested by it, "the peril of perjury" against which the Statute of Frauds was designed to guard "is largely, if not entirely, absent," and the defendant's obligation to pay reasonable compensation for those services is implied. 23 N.Y.2d at 574–6, 297 N.Y.S.2d at 952–3, 245 N.E.2d at 715–16.

It is against this legal backdrop that I now re-examine Falcon's Statute of Frauds defense in the instant case. Critically, Springwell's president, Roger Vincent, has already testified at deposition that Falcon never asked Springwell to approach DLJ to see if DLJ was interested in acting as Falcon's underwriter for the 1994 and 1995 Note Offerings. (Vincent Dep. at 323.) While this admission would seem to undermine Springwell's fee claim based upon DLJ's involvement in the 1994 and 1995 Note Offerings, Springwell argues that a fee is nevertheless due because: (1) its finder's agreement with Falcon contemplated a fee not only for introducing Falcon to direct sources of capital (i.e. direct investors in the company), but also for introducing Falcon to intermediaries, like DLJ, whose business function is to raise capital for companies indirectly by arranging public or private offerings; and (2) the parties' finder's agreement contemplated that the successful introduction of Falcon to an intermediary like DLJ would entitle Springwell to a fee based upon any transaction thereafter arranged for Falcon by the intermediary. Accordingly, Springwell claims that even though Falcon never engaged it specifically to approach DLJ in connection with the 1994 and 1995 Note Offerings, it was Springwell's March 1993 introduction of Falcon to Lundy, and its subsequent follow-up efforts with Lundy, that led to Falcon's retention of DLJ to manage the 1994 and 1995 Note Offerings, and which in turn raised substantial capital for Falcon's business. Given the great benefit Falcon has reaped from working with DLJ, Springwell claims it is entitled to a commission.

Despite Springwell's representations of its oral agreement with Falcon, I previously dis-

missed Springwell's claim under the Statute of Frauds because none of the twelve writings offered to the Court at that time, when read separately or together, evinced the kind of open-ended, broad-based agreement alleged by Springwell. *See* 1998 WL 230989, at * 9–10. Certainly, none of the writings indicated that Falcon had engaged Springwell's services in connection with the 1994 and 1995 Note Offerings or to find an underwriter for those or any other transactions. Nor did the writings evince an agreement of any kind contemplating that commissions or fees would be payable to Springwell based upon transactions not mentioned in those writings. The one document reflecting Springwell's approach of DLJ on Falcon's behalf (a February 24, 1993 letter from Vincent to Lundy, and copied to Falcon) was limited to a discussion of potential financing for the Hutchnance Project, a Falcon project unrelated to the 1994 and 1995 Note Offerings. Finally, none of the twelve documents contained an acknowledgment by Falcon that Springwell had performed under their agreement and was entitled to compensation based upon the 1994 and 1995 Note Offerings. Accordingly, for the reasons stated in my prior opinion, I concluded that even under the most liberal reading of *Morris Cohon*, the writings previously offered by Springwell could not satisfy the Statute of Frauds. Particularly in a case such as this where Springwell's fee claim was premised upon an alleged oral agreement of broad scope and unlimited duration, I found that the peril of perjury was too great to permit a quantum meruit claim to go forward absent some written evidence that Falcon's engagement of Springwell's services was as broad as alleged.

The Ziegler letter, however, provides the missing written evidence. First, the Ziegler letter does specifically reference Falcon's 1994 Note Offering ("Re: Falcon Senior Note Offering"), stating under that caption: "I have had several conversations with Roger Vincent *concerning his retainer in connection with financial services rendered to Falcon.* As you are aware, *Roger* [Vincent], *at our request, introduced* Falcon to Tony Lundy of DLJ *and performed various liaison services* with DLJ thereafter." (Emphasis added.) The discussion in the letter that

followed concerned a "finder's fee or an introduction fee" for the "$120,000,000 financing," which matched the amount of the 1994 Note Offering. Reading the letter in the light most favorable to Springwell—as the Court is required to do on this summary judgment motion—this letter as a whole indicates that: (i) Falcon engaged Springwell to introduce it to DLJ; (ii) Springwell performed the introduction as well as other "liaison services" with DLJ; (iii) Falcon benefitted from Springwell's services; and (iv) Springwell's services related to DLJ's participation in the 1994 Note Offering. This last point is the most critical. The fact that Ziegler acknowledged Springwell's performance in the context of the 1994 Note Offering undercuts Falcon's contention that Springwell's finder role was strictly limited to discrete prior projects and the finding of direct investors. Rather, it supports Springwell's contention that the agreement more broadly contemplated the payment of some kind of fee for an introduction that aided Falcon in its capital campaign, either directly or indirectly.

The last two lines of the letter further underscore that the disagreement between the parties appeared limited to the amount of compensation, not to the expectation that some compensation would be paid: "I don't think there is any question that a finder's fee or an introduction fee based on $120,000,000 financing might be significant. However, I don't think Roger is looking for anything unreasonable. . . ." Again, read in the light most favorable to Springwell, these lines reflect Ziegler's belief that Springwell was entitled to some fee based upon the 1994 Note Offering; the only question was what amount was reasonable for the services provided. *See Morris Cohon*, 23 N.Y.2d at 575, 297 N.Y.S.2d at 952, 245 N.E.2d at 715 (writing relied upon "must be read as a whole, and by reasonable construction and necessary implication").

While the Ziegler letter is not without some ambiguity, the expansive reading most courts have given to quantum meruit claims persuades the Court that in light of the Ziegler letter, Springwell's quantum meruit claim cannot be dismissed under the Statute

of Frauds for lack of a sufficient writing. In particular, Ziegler's express acknowledgment that Springwell was in fact of service to Falcon in dealing with DLJ entitles Springwell to have a jury decide the reasonable value, if any, of the services Springwell provided. To bar Springwell's claim in the face of the Ziegler letter might risk shielding Falcon from liability unfairly. *See Morris Cohon,* 23 N.Y.2d at 574, 297 N.Y.S.2d at 952, 245 N.E.2d at 715 ("[t]he Statute of Frauds was not enacted to afford persons a means of evading just obligations") Further, while the risk of perjurious testimony persists to some degree, it is greatly diminished by Ziegler's written acknowledgment, in the context of the 1994 Note Offering, that Springwell performed services requested of it relating to DLJ.[3]

Whether Springwell recovers at trial will depend on the resolution of many disputed and close issues. As noted and contrary to Springwell's contentions, Falcon denies that Ziegler or Webster ever promised to recompense Springwell for finding indirect sources of capital, or for finding capital for Falcon's post–1993 transactions: Falcon maintains that Springwell was promised recompense only for identified transactions which occurred in 1992 or 1993, and not for unidentified transactions in which Springwell provided no direct services. Further, there remains a disputed issue as to whether Ziegler had authority to bind Falcon to a finder's agreement of the breadth and unlimited duration Springwell alleges to have existed in this case. Although Springwell has shown that Ziegler acted on behalf of Falcon in a wide variety of contexts sufficient to defeat Falcon's motion for summary judgment on this basis, the issue of express and apparent authority will still have to be litigated at trial and the reasonableness of Springwell's reliance thereon determined.[4] Significantly, if Springwell convinces the finder of facts on these and other predicate questions, the finder of facts will also have to resolve the conflict between experts on industry practice as to the amount of compensation to which Springwell is entitled. Springwell concedes it never discussed with Falcon the manner in which its successful introduction or services would be compensated. From the Court's perspective, Springwell's claim to fee upwards of $1 million based upon the 1994 and 1995 Note Offering seems unrealistic. While Springwell's introduction of Falcon to DLJ may have been of significant help to Falcon, the fact remains that DLJ, not Springwell, did the actual work of finding investors for Falcon. In that regard, Falcon has already proffered expert testimony indicating that within the industry, there is an important distinction between the role of a finder who obtains capital directly from a principal source and one who arranges an introduction to an intermediary or underwriter that then raises the capital through a public or private offering. In the latter case, Falcon's expert maintains, where the finder is not performing any direct services in securing the capital, the finder's compensation is much smaller and is usually paid by the underwriter. (See Falcon's Mem. of Law in Support its Motion for Summary Judgment, at 13.) Thus, many issues remain in this action to be taken up at trial.

## A. *Accord and Satisfaction*

In its initial motion, Falcon also applied for summary judgment on the ground that Springwell's acceptance and deposit of a $25,000 check from Falcon in 1994 constituted an accord and satisfaction with respect to any fee to which Springwell might have been

---

**3.** On that note, the Court is troubled by the fact that Ziegler submitted an affidavit to this Court that appears to be inconsistent with the content of his April 8, 1994 letter. Before the letter was ordered disclosed, Ziegler stated under oath that he was "outraged" by Springwell's request for a commission based upon the 1994 and 1995 Note Offerings. (Ziegler Aff. ¶ 14.) That statement strains credulity in light of the contemporaneous writing in which Ziegler not only did not object to Springwell's request for a fee, but also acknowledged Springwell's performance of ser-

vices for Falcon and suggested that a fee of some kind was warranted.

**4.** The Court also expects that Falcon may attempt to prove at trial that the Ziegler letter, when properly interpreted in the light of witness testimony, does not constitute an admission of performance in connection with the 1994 or 1995 Note Offerings and reflects only Ziegler's advice to Webster in the context of settlement.

entitled. I did not address this argument in the prior motion because I granted summary judgment under the Statute of Frauds. However, now that I have dismissed Falcon's Statute of Frauds defense, I must consider this alternative defense.

The facts relevant to Falcon's accord and satisfaction defense are as follows. It is undisputed that, after Falcon concluded its 1994 Note Offering, Roger Vincent contacted Ziegler to discuss Springwell's commission resulting from Falcon's engagement of DLJ as an underwriter. Springwell claims that Ziegler did not dispute its entitlement to a fee and after speaking with Webster, told Vincent that Springwell should bill Falcon for its services in the form of an annual retainer of $25,000 a year. (Springwell's account in that regard is corroborated by the Ziegler letter.) According to Springwell, Ziegler and Webster wanted it to proceed in this fashion because they were concerned that a single, lump-sum payment to Springwell would create a problem for them with Falcon's majority shareholders. Thereafter, Springwell sent Falcon an invoice for $25,000, dated June 2, 1994, with the annotation "Financial Advisory Services—Annual Retainer." Falcon paid the amount, but crossed out the words "Annual Retainer" on the return copy of the invoice. The return copy of the invoice also bore the handwritten notation by Webster: "Falcon–Def Fin [deferred financing] costs-DLJ." Springwell deposited the $25,000 check without complaint. Nine months later, however, Springwell wrote to Falcon to settle its claim for additional fees.

"As a general rule, acceptance of a check in full settlement of a disputed unliquidated claim operates as an accord and satisfaction discharging the claim." *Merrill Lynch Realty/Carll Burr, Inc. v. Skinner,* 63 N.Y.2d 590, 596, 483 N.Y.S.2d 979, 982, 473 N.E.2d 229, 232 (1984) (citations omitted). "The theory is that the parties have made a new contract discharging all or part of their obligations under the original contract." *Id.* However, in order for an accord and satisfaction to be established, the person receiving the check must have been clearly informed that acceptance of the amount offered will settle or

discharge the disputed claim. *Id. See also Complete Messenger & Trucking Corp. v. Merrill Lynch Money Markets, Inc.,* 169 A.D.2d 609, 610–11, 565 N.Y.S.2d 794, 796 (1st Dep't 1991) ("An essential element of an accord and satisfaction is a clear manifestation of intent by one tendering less than full payment of an unliquidated claim that the payment has been sent in full satisfaction of the disputed claim."); *Macon v. Arnlie Realty Co.,* 207 A.D.2d 268, 271, 615 N.Y.S.2d 28, 30 (1st Dep't 1994) (dismissing accord and satisfaction defense where "there was no unequivocal expression" by defendant that it was tendering the full satisfaction of an unliquidated debt). Indeed, to raise the defense, a defendant's expression must be so clear and unequivocal that in *C. Itoh & Co. v. F.W. Honerkamp Co., Inc.,* 99 A.D.2d 417, 418, 470 N.Y.S.2d 593, 594–95 (1st Dep't 1984), the Court denied summary judgment on an accord and satisfaction defense even though the defendant's clearly check stated "payment in full" on the front; the Court found that, because those words "were not highlighted or marked in any way as to draw attention to [them]," there remained an issue of fact "as to whether plaintiff was aware that negotiation of the check would constitute an accord and satisfaction." *Id.*

Based upon these well-settled principles, I find that Falcon's accord and satisfaction defense is deficient as a matter of law. Although Webster crossed out the words "annual retainer" on the invoice for $25,000, he did not place any legend on the check, such as "payment in full," which would have put Springwell on notice of Falcon's intention to settle Springwell's claim. Nor did any letter or note accompanying the $25,000 check indicate that Falcon meant that payment to settle the entire disputed claim. The mere crossing out of the words "annual retainer" and insertion of the words "Falcon–Def Fin costs-DLJ" on the return invoice falls far short of type of "unequivocal expression" required to establish an accord and satisfaction. *See Macon v. Arnlie Realty Co.,* 207 A.D.2d at 271, 615 N.Y.S.2d at 30. Further, Vincent testified at deposition that Falcon never informed Springwell that acceptance of its

$25,000 check was in full satisfaction or settlement of Springwell's claim.[5]

### CONCLUSION

For the reasons stated, upon reconsideration of the Court's earlier grant of summary judgment in light of new evidence, the Court denies the defendant's motion for summary judgment. The Clerk of the Court is directed to vacate any judgment of dismissal entered in this action and to reactivate the action on the Court's calendar. Further, the parties are directed to appear before the Court for a pretrial conference on October 1, 1998, at 4:00 p.m., Courtroom 14 B, for a trial date to be set. The parties are to know the availability of their witnesses and counsel for the remainder of the year.

SO ORDERED.

**5.** Although Falcon's $25,000 payment to Springwell does not constitute an accord and satisfaction, that amount unquestionably must be subtracted from any award of compensation, if any, Springwell receives at trial.