**Craig P. NADEL, Plaintiff–Counter–Defendant–Appellant–Cross–Appellee,**

v.

**PLAY–BY–PLAY TOYS & NOVELTIES, INC., Defendant–Counter–Claimant–Appellee–Cross–Appellant.**

**Docket Nos. 99–7214, 99–7232.**

United States Court of Appeals, Second Circuit.

Argued: Nov. 10, 1999

Decided: March 27, 2000

---

Martin B. Pavane, Cohen, Pontani, Lieberman & Pavane, New York, NY (Catrio-na M. Collins, on the brief), for plaintiff-counter-defendant-appellant-cross-appellee.

Raymond A. Kurz, Rothwell, Figg, Ernst & Kurz, Washington, DC (Celine Jimenez Crowson, on the brief), for defendant-counter-claimant-appellee-cross-appellant.

Before: CARDAMONE, SOTOMAYOR and KATZMANN, Circuit Judges.

SOTOMAYOR, Circuit Judge

Plaintiff-appellant Craig P. Nadel ("Nadel") brought this action against defendant-appellee Play–By–Play Toys & Novelties, Inc. ("Play–By–Play") for breach of contract, quasi contract, and unfair competition. The thrust of Nadel's complaint was that Play–By–Play took his idea for an upright, sound-emitting, spinning plush toy and that, contrary to industry custom, Play–By–Play used the idea in its "Tornado Taz" product without paying him compensation. Play–By–Play also filed several counterclaims against Nadel, alleging that Nadel falsely told other members of the toy industry that Play–By–Play had stolen his idea, thereby harming its ability to receive toy concepts from toy industry members.

For the reasons that follow, we vacate that part of the district court's order granting Play–By–Play's motion for summary judgment and dismissing Nadel's complaint and affirm that part of the district court's order dismissing Play–By–Play's counterclaims.

## BACKGROUND

Nadel is a toy idea man. Toy companies regularly do business with independent inventors such as Nadel in order to develop and market new toy concepts as quickly as possible. To facilitate the exchange of ideas, the standard custom and practice in the toy industry calls for companies to treat the submission of an idea as confidential. If the company subsequently uses

the disclosed idea, industry custom provides that the company shall compensate the inventor, unless, of course, the disclosed idea was already known to the company.

In 1996, Nadel developed the toy concept at issue in this case. He transplanted the "eccentric mechanism"[1] found in several hanging Halloween toys then on the market—such as "Spooky Skull" and "Shaking Mutant Pumpkin"—and placed the mechanism inside of a plush toy monkey skin to develop the prototype for a new table-top monkey toy. This plush toy figure sat upright, emitted sound, and spun when placed on a flat surface.

In October 1996, Nadel met with Neil Wasserman, an executive at Play–By–Play who was responsible for the development of its plush toy line. According to Nadel, he showed his prototype monkey toy to Wasserman, who expressed interest in adapting the concept to a non-moving, plush Tazmanian Devil toy that Play–By–Play was already producing under license from Warner Bros. Nadel contends that, consistent with industry custom, any ideas that he disclosed to Wasserman during their October 1996 meeting were subject to an agreement by Play–By–Play to keep such ideas confidential and to compensate Nadel in the event of their use.

Nadel claims that he sent his prototype monkey toy to Wasserman as a sample and awaited the "Taz skin" and voice tape, which Wasserman allegedly said he would send, so that Nadel could make a sample spinning/laughing Tazmanian Devil toy for Play–By–Play. Wasserman never provided Nadel with the Taz skin and voice tape, however, and denies ever having received the prototype monkey toy from Nadel.

Notwithstanding Wasserman's denial, his secretary, Melissa Rodriguez, testified that Nadel's prototype monkey toy remained in Wasserman's office for several months. According to Ms. Rodriguez, the monkey toy was usually kept in a glass cabinet behind Wasserman's desk, but she remembered that on one occasion she had seen it on a table in Wasserman's office. Despite Nadel's multiple requests, Wasserman did not return Nadel's prototype monkey toy until February 1997, after Play–by–Play introduced its "Tornado Taz" product at the New York Toy Fair.

The parties do not dispute that "Tornado Taz" has the same general characteristics as Nadel's prototype monkey toy. Like Nadel's toy, Tornado Taz is a plush toy that emits sounds (including "screaming," "laughing," "snarling," and "grunting"), sits upright, and spins by means of an internal eccentric vibration mechanism.

Nadel claims that, in violation of their alleged agreement, Play–By–Play used his idea without paying him compensation. Play–By–Play contends, however, that it independently developed the Tornado Taz product concept and that Nadel is therefore not entitled to any compensation. Specifically, Play–By–Play maintains that, as early as June or July of 1996, two of its officers—Wasserman and Slattery—met in Hong Kong and began discussing ways to create a spinning or vibrating Tazmanian Devil, including the possible use of an eccentric mechanism. Furthermore, Play–By–Play claims that in late September or early October 1996, it commissioned an outside manufacturing agent—Barter Trading of Hong Kong—to begin developing Tornado Taz.

Play–By–Play also argues that, even if it did use Nadel's idea to develop Tornado Taz, Nadel is not entitled to compensation because Nadel's concept was unoriginal and non-novel to the toy industry in October 1996. In support of this argument, Play–By–Play has submitted evidence of various toys, commercially available prior to October 1996, which used eccentric motors and allegedly contained the same

---

1. An eccentric mechanism typically consists of a housing containing a motor with an eccentric weight attached to the motor shaft. When the motor is activated, the motor rotates the weight centrifugally, causing the housing to shake or spin.

characteristics as Nadel's prototype monkey toy.

In connection with its counterclaims, Play–By–Play alleges that Nadel falsely told other members of the toy industry that Play–By–Play had stolen his toy idea, thereby damaging its ability to receive new toy concepts from toy industry members. Play–By–Play claims, for example, that Nadel frustrated its business negotiations with a company called Wow Wee. Specifically, Play–By–Play alleges that because of Nadel's false statements, Wow Wee broke off its business negotiations with Play–By–Play and approached other toy manufacturers before ultimately returning to Play–By–Play to conclude a deal. Play–By–Play contends that it suffered damages because of the resultant delay in bringing Wow Wee's toy concept to market.

Similarly, Play–By–Play alleges that Nadel's false statements damaged its business relationship with Andrew Ferber, a toy developer. Ferber was a former business associate of Nadel who attended Nadel's October 1996 meeting with Wasserman so that he could pitch his "conductive ink" technology to Play–By–Play for possible use in a Looney Tunes pillow. A follow-up meeting between Wasserman and Ferber was scheduled, but Wasserman never appeared for that meeting. Ferber testified that he learned of Nadel's lawsuit from Nadel and that he would be less willing to do business with Play–By–Play as a result. Ferber and Play–By–Play have not done business together.

## DISCUSSION

### I. NADEL'S CLAIMS

On January 21, 1999, the district court granted Play–By–Play's motion for summary judgment dismissing Nadel's claims for breach of contract, quasi contract, and unfair competition.[2] Interpreting New

York law, the district court stated that "a party is not entitled to recover for theft of an idea unless the idea is novel or original." *Nadel v. Play By Play Toys & Novelties, Inc.,* 34 F.Supp.2d 180, 184 (S.D.N.Y.1999). Applying that principle to Nadel's claims, the district court concluded that, even if the spinning toy concept were novel to Play–By–Play at the time Nadel made the disclosure to Wasserman in October 1996, Nadel's claims must nonetheless fail for lack of novelty or originality because "numerous toys containing the characteristics of [Nadel's] monkey were in existence prior to [ ] October 1996." *Id.* at 185. In essence, the district court interpreted New York law to require that, when a plaintiff claims that a defendant has either (1) misappropriated his idea (a "property-based claim") or (2) breached an express or implied-in-fact contract by using such idea (a "contract-based claim"), the idea at issue must be original or novel generally. *See id.* at 184 n. 1. Thus, according to the district court, a finding that an idea was novel as to *Play By Play—i.e.,* novel to the buyer—cannot suffice to sustain any of Nadel's claims. *See id.*

On appeal, Nadel challenges the district court's conclusion that a showing of novelty to the buyer—*i.e.,* that Nadel's idea was novel to Play–By–Play at the time of his October 1996 disclosure—cannot suffice to sustain his claims for breach of contract, quasi contract, and unfair competition under New York law. Nadel claims, moreover, that the record contains a genuine issue of material fact concerning whether his toy idea was novel to Play–By–Play at the time of his October 1996 disclosure to Wasserman and that the district court therefore erred in granting Play–By–Play's motion for summary judgment.

Nadel's factual allegations present a familiar submission-of-idea case: (1) the

---

**2.** The gravamen of Nadel's "unfair competition" claim appears to be "[d]efendant's misappropriation of [p]laintiff's concept." While we will treat Nadel's unfair competition claim as a claim for misappropriation of Nadel's idea, we take no position here as to whether, under New York law, a claim for unfair competition subsumes a claim for misappropriation of property.

parties enter into a pre-disclosure confidentiality agreement; (2) the idea is subsequently disclosed to the prospective buyer; (3) there is no post-disclosure contract for payment based on use; and (4) plaintiff sues defendant for allegedly using the disclosed idea under either a contract-based or property-based theory. For the reasons that follow, we conclude that a finding of novelty as to Play–By–Play can suffice to provide consideration for Nadel's contract claims against Play–By–Play. Accordingly, because we also find that there exists a genuine issue of material fact as to whether Nadel's idea was novel to Play–By–Play at the time of his October 1996 disclosure, we vacate the district court's grant of summary judgment on Nadel's contract claims. With respect to Nadel's misappropriation claim, we similarly vacate the district court's grant of summary judgment and remand for further proceedings to determine whether Nadel's idea was original or novel generally.

### A. Submission–of–Idea Cases Under New York Law

Our analysis begins with the New York Court of Appeals' most recent discussion of the law governing idea submission cases, *Apfel v. Prudential–Bache Securities, Inc.*, 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993). In *Apfel*, the Court of Appeals discussed the type of novelty an idea must have in order to sustain a contract-based or property-based claim for its uncompensated use. Specifically, *Apfel* clarified an important distinction between the requirement of "novelty to the buyer" for contract claims, on the one hand, and "originality" (or novelty generally) for misappropriation claims, on the other hand.

Under the facts of *Apfel*, the plaintiff disclosed his idea to the defendant pursuant to a confidentiality agreement and, subsequent to disclosure, entered into another agreement wherein the defendant agreed to pay a stipulated price for the idea's use. *See id.* at 474, 600 N.Y.S.2d 433, 616 N.E.2d 1095. The defendant used the idea but refused to pay plaintiff pursuant to the post-disclosure agreement on the asserted ground that "no contract existed between the parties because the sale agreement lacked consideration." *Id.* at 475, 600 N.Y.S.2d 433, 616 N.E.2d 1095. The defendant argued that an idea could not constitute legally sufficient consideration unless it was original or novel generally and that, because plaintiff's idea was not original or novel generally (it had been in the public domain at the time of the post-disclosure agreement), the idea provided insufficient consideration to support the parties' post-disclosure contract. *See id.* at 474–75, 600 N.Y.S.2d 433, 616 N.E.2d 1095.

In rejecting defendant's argument, the Court of Appeals held that there was sufficient consideration to support plaintiff's contract claim because the idea at issue had value to the defendant at the time the parties concluded their post-disclosure agreement. *See id.* at 476, 600 N.Y.S.2d 433, 616 N.E.2d 1095. The *Apfel* court noted that "traditional principles of contract law" provide that parties "are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value," *id.* at 475, 600 N.Y.S.2d 433, 616 N.E.2d 1095, and that, so long as the "defendant received something of value" under the contract, the contract would not be void for lack of consideration, *id.* at 476, 600 N.Y.S.2d 433, 616 N.E.2d 1095. *See also id.* at 478, 600 N.Y.S.2d 433, 616 N.E.2d 1095 ("[T]he buyer knows what he or she is buying and has agreed that the idea has value, and the Court will not ordinarily go behind that determination.").

The *Apfel* court explicitly rejected defendant's contention that the court should carve out "an exception to traditional principles of contract law" for submission-of-idea cases by requiring that an idea must also be original or novel generally in order to constitute valid consideration. *Id.* at 477, 600 N.Y.S.2d 433, 616 N.E.2d 1095.

In essence, the defendant sought to impose a requirement that an idea be novel in absolute terms, as opposed to only the defendant buyer, in order to constitute valid consideration for the bargain. In rejecting this argument, the *Apfel* court clarified the standards for both contract-based and property-based claims in sub-mission-of-idea cases. That analysis guides our decision here.

The *Apfel* court first noted that "novelty as an element of an idea seller's claim" is a distinct element of proof with respect to both (1) "a claim based on a property theory" and (2) "a claim based on a con-tract theory." *Id.* at 477, 600 N.Y.S.2d 433, 616 N.E.2d 1095. The court then proceeded to discuss how the leading sub-mission-of-idea case—*Downey v. General Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257 (1972)—treated novel-ty with respect to property-based and con-tract-based claims.[3] First, the *Apfel* court explained that the plaintiff's property-based claims for misappropriation were dismissed in *Downey* because "the ele-ments of novelty and originality [were] absent," *i.e.*, the ideas were so common as to be unoriginal and known generally. *Apfel*, 81 N.Y.2d at 477, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (quoting *Downey*, 31 N.Y.2d at 61, 334 N.Y.S.2d 874, 286 N.E.2d 257) (alteration in original); *accord Dow-ney*, 31 N.Y.2d at 61–62, 334 N.Y.S.2d 874, 286 N.E.2d 257 (holding that the submitted idea—marketing Jell–O to children under the name "Mr. Wiggle"—was "lacking in novelty and originality" because the idea was merely the "use of a word ('wiggley' or 'wiggle') descriptive of the most obvious characteristic of Jell–O, with the prefix 'Mr.' added"). Second, the *Apfel* court explained that the plaintiff's contract claims in *Downey* had been dismissed on the separate ground that the "defendant possessed plaintiff's ideas prior to plain-tiff's disclosure [and thus], the ideas could have no value to defendant and could not supply consideration for any agreement between the parties." *Apfel*, 81 N.Y.2d at 477, 600 N.Y.S.2d 433, 616 N.E.2d 1095; *accord Downey*, 31 N.Y.2d at 62, 334 N.Y.S.2d 874, 286 N.E.2d 257 (finding that, where defendant had used the words "wig-gles" and "wigglewam" in prior advertis-ing, defendant could "rel[y] on its own previous experience" and "was free to make use of 'Mr. Wiggle' without being obligated to compensate the plaintiff").

By distinguishing between the two types of claims addressed in *Downey* and the different bases for rejecting each claim, the New York Court of Appeals clarified that the novelty requirement in submis-sion-of-idea cases is different for misappro-priation of property and breach of contract claims. The Court of Appeals underscored this important distinction by citing *Ferber v. Sterndent Corp.*, 51 N.Y.2d 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980), which also refers to the two different types of novelty, *i.e.*, novelty to the buyer and nov-elty generally. *See Apfel*, 81 N.Y.2d at 477, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (citing *Ferber*, 51 N.Y.2d at 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311). In *Ferber*, the Court of Appeals affirmed the lower court's grant of summary judgment in fa-vor of the defendant because "[p]laintiff failed to produce any evidence to support his claim that the idea which he disclosed to defendants was novel *either* in the ab-stract *or* as to them." *Ferber*, 51 N.Y.2d at 783, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (emphasis added); *see also Bram v. Dan-non Milk Prods., Inc.*, 33 A.D.2d 1010, 307 N.Y.S.2d 571 (1st Dep't 1970) (holding that summary judgment should have been

**3.** Although the *Downey* court referred to the plaintiff's case as an "action ... for the al-leged misappropriation of an idea," *Downey*, 31 N.Y.2d at 58 & n. 1, 334 N.Y.S.2d 874, 286 N.E.2d 257, it is clear from the decision ap-pealed from that plaintiff's fourteen causes of action included contract, quasi-contract, and misappropriation claims. *See Downey v. Gen-eral Foods Corp.*, 37 A.D.2d 250, 323 N.Y.S.2d 578 (2d Dep't 1971), *rev'd*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257 (1972). This explains why the *Downey* court addressed plaintiff's appeal under both contract and misappropriation of property theories.

granted to defendants on all claims where plaintiff's idea was both "lacking in novelty" *and* "had been utilized by the defendants ... prior to its submission").

■ Thus, the *Apfel* court refused to read *Downey* and "similar decisions"[4] as requiring originality or novelty generally in all cases involving disclosure of ideas. *See Apfel,* 81 N.Y.2d at 476–77, 600 N.Y.S.2d 433, 616 N.E.2d 1095 ("These decisions do not support [the] contention that novelty [in absolute terms] is required in all cases involving disclosure of ideas."). Rather, the *Apfel* court clarified that the longstanding requirement that an idea have originality or general novelty in order to support a misappropriation claim does not apply to contract claims. *See Oasis Music, Inc. v. 900 U.S.A., Inc.,* 161 Misc.2d 627, 614 N.Y.S.2d 878, 881 (1994) (noting that "the *Apfel* court did not repudiate the long line of cases requiring novelty in certain situations[,] ... the *Apfel* court merely clarified that novelty is not required in

all cases"). For contract-based claims in submission-of-idea cases, a showing of novelty to the buyer will supply sufficient consideration to support a contract.

■ Moreover, *Apfel* made clear that the "novelty to the buyer" standard is not limited to cases involving an express post-disclosure contract for payment based on an idea's use. The *Apfel* court explicitly discussed the pre-disclosure contract scenario present in the instant case, where "the buyer and seller contract for *disclosure* of the idea with payment based on use, but no separate postdisclosure contract for the *use* of the idea has been made." *Apfel,* 81 N.Y.2d at 477–78, 600 N.Y.S.2d 433, 616 N.E.2d 1095. In such a scenario, a seller might, as Nadel did here, bring an action against a buyer who allegedly used his ideas without payment, claiming both misappropriation of property and breach of an express or implied-in-fact contract.[5] The *Apfel* court recognized that

---

4. The *Apfel* court also discussed the Appellate Division's decision in *Soule v. Bon Ami Co.,* 201 A.D. 794, 195 N.Y.S. 574 (2d Dep't 1922), *aff'd on other grounds,* 235 N.Y. 609, 139 N.E. 754 (1923), which has been "frequently cited" for the proposition that the plaintiff was denied recovery on the ground that "the bargain lacked consideration because the idea was not novel." *Apfel,* 81 N.Y.2d at 477, 600 N.Y.S.2d 433, 616 N.E.2d 1095. The *Apfel* court undermined the rationale for that holding by emphasizing that the Appellate Division's decision to deny plaintiff recovery had been affirmed "on a different basis," *i.e.,* that the *Soule* plaintiff "had failed to show that profits resulted from the disclosure" of plaintiff's ideas. *Id.; accord Soule v. Bon Ami Co.,* 235 N.Y. 609, 139 N.E. 754 (1923). In any event, the reasoning articulated by the Appellate Division in *Soule* may be viewed as consistent with *Apfel* insofar as the case can be read as holding that the contract lacked consideration because the idea was so unoriginal and non-novel that it was essentially "an idea known to every person," *Soule,* 195 N.Y.S. at 576, including the buyer. *See infra* at 378–79.

5. Where the pre-disclosure agreement is not an express contract to pay for the disclosed idea, an idea seller may argue in the alternative, *cf. Watts v. Columbia Artists Mgmt. Inc.,* 188 A.D.2d 799, 591 N.Y.S.2d 234, 236 (3d

Dep't 1992) (noting that express contract and implied-in-fact contract theories are mutually exclusive), that the parties entered into an agreement implied-in-fact. *See Robbins v. Frank Cooper Assocs.,* 14 N.Y.2d 913, 252 N.Y.S.2d 318, 200 N.E.2d 860 (1964) (finding an implied-in-fact contract for the reasonable value of plaintiff's idea for a television program format where the parties had failed to reduce their agreement to writing). Unlike an express contract, an implied-in-fact contract arises "when the agreement and promise have simply not been expressed in words," but "a court may justifiably infer that the promise would have been explicitly made, had attention been drawn to it." *Maas v. Cornell Univ.,* 94 N.Y.2d 87, 93–94, 699 N.Y.S.2d 716, 721 N.E.2d 966 (1999).

Of course, the mere disclosure of an unoriginal idea to a defendant, to whom the idea is novel, will not automatically entitle a plaintiff to compensation upon the defendant's subsequent use of the idea. An implied-in-fact contract "requires such elements as consideration, mutual assent, legal capacity and legal subject matter." *Id.* (internal quotation marks omitted). The existence of novelty to the buyer only addresses the element of consideration necessary for the formation of the contract. Thus, apart from consideration, the formation of a contract implied-in-fact will depend on the presence of the other elements.

these cases present courts with the difficult problem of determining "whether the idea the buyer was using was, in fact, the seller's." *Id.* at 478, 600 N.Y.S.2d 433, 616 N.E.2d 1095. Specifically, the court noted that, with respect to a misappropriation of property claim, it is difficult to "prove that the buyer obtained the idea from [the seller] and nowhere else." *Id.* With respect to a breach of contract claim, the court noted that it would be inequitable to enforce a contract if "it turns out upon disclosure that the buyer already possessed the idea." *Id.* The court then concluded that, with respect to these cases, "[a] showing of novelty, at least novelty as to the buyer" should address these problems.[6] *Id.*

We note, moreover, that the "novelty to the buyer" standard comports with traditional principles of contract law. While an idea may be unoriginal or non-novel in a general sense, it may have substantial value to a particular buyer who is unaware of it and therefore willing to enter into contract to acquire and exploit it. *See Apfel,* 81 N.Y.2d at 475–76, 600 N.Y.S.2d 433, 616 N.E.2d 1095; Robert Unikel, *Bridging the "Trade Secret" Gap: Protecting "Confidential Information" Not Rising to the Level of Trade Secrets,* 29 Loy. U. Chi. L.J. 841, 877 n. 151 (1998) (noting that, if a valuable idea is already known to an industry but has not yet been acquired by a prospective buyer, one of two circumstances may exist: "(1) the person[ ] ha[s] not identified the potential value of the easily acquired information; or (2) the person[ ] ha[s] not identified the means, however easy or proper, for obtaining the valuable information"). As the *Apfel* court emphasized, "the buyer may reap benefits from such a contract in a number of ways—for instance, by not having to expend resources pursuing the idea through other channels or by having a profit-making idea implemented sooner rather than later." *Apfel,* 81 N.Y.2d at 478, 600 N.Y.S.2d 433, 616 N.E.2d 1095.

In fact, the notion that an unoriginal idea may still be novel (and valuable) to a particular buyer is not itself a novel proposition. In *Keller v. American Chain Co.,* 255 N.Y. 94, 174 N.E. 74 (1930)—which is cited by *Apfel*—the parties entered into a verbal pre-disclosure contract whereby the plaintiff allegedly agreed to disclose money-saving information to the defendant in exchange for one-third of the savings realized. *See id.* at 96–97, 174 N.E. 74. The disclosed idea—that the defendant could use a more favorable freight rate classification for his auto chains—was not original or novel to the industry, as several railroads already adhered to the lower rate. *See id.* at 97–98, 174 N.E. 74. Nonetheless, the *Keller* court stated that, where the defendant used and benefited from information otherwise unknown to it, there can be sufficient consideration to enforce

The element of mutual assent, for example, must be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing. *Cf. id.* at 94, 699 N.Y.S.2d 716, 721 N.E.2d 966.

6. We note that this particular sentence could be read out of context to suggest that novelty to the buyer will alone support a misappropriation claim under New York law. However, nothing in *Apfel* otherwise suggests that the Court of Appeals meant to supplant the longstanding requirement that originality or novelty generally must be shown to support a misappropriation claim. In any event, the express language *"at least* novelty as to the buyer," *Apfel,* 81 N.Y.2d at 478, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (emphasis added), does not contradict the implicit proposition that one must still meet the *additional requirement* of showing originality or novelty generally. In fact, that language merely reflects the rather unremarkable proposition that novelty to the buyer must exist for a misappropriation claim to survive, because no one can be held liable for misappropriating an idea that was already known to him. *See AEB & Assocs. Design Group, Inc. v. Tonka Corp.,* 853 F.Supp. 724, 734 (S.D.N.Y.1994) ("[E]ven where a plaintiff's concept is novel and original, recovery will be denied where it is established that the party alleged to have misappropriated another's concept, arrived on its own initiative or by wholly independent means at a concept similar to that devised by the party seeking recovery for misappropriation.") (internal quotation marks and citations omitted).

the parties' pre-disclosure contract.[7]  *See id.* at 98, 174 N.E. 74.

■ In contrast to contract-based claims, a misappropriation claim can only arise from the taking of an idea that is original or novel in absolute terms, because the law of property does not protect against the misappropriation or theft of that which is free and available to all.  *See Murray v. National Broad. Co.,* 844 F.2d 988, 993 (2d Cir.1988) ("Since ... non-novel ideas are not protectible as property, they cannot be stolen."); *cf. Ed Graham Prods., Inc. v. National Broad. Co.,* 75 Misc.2d 334, 347 N.Y.S.2d 766, 769 (1973) ("Ideas such as those presented by the plaintiff are in the public domain and may freely be used by anyone with impunity."); *Educational Sales Programs, Inc. v. Dreyfus Corp.,* 65 Misc.2d 412, 317 N.Y.S.2d 840, 843 (1970) ("An idea is impalpable, intangible, incorporeal, yet it may be a stolen gem of great value, or mere dross of no value at all, depending on its novelty and uniqueness.").

■ Finally, although the legal requirements for contract-based claims and property-based claims are well-defined, we note that the determination of novelty in a given case is not always clear.  *Cf. AEB & Assocs. Design Group, Inc. v. Tonka Corp.,* 853 F.Supp. 724, 734 (S.D.N.Y.1994) ("In establishing an idea's originality, a plaintiff cannot rest on mere assertions, but must demonstrate some basis in fact for its claims.").  The determination of whether an idea is original or novel depends upon several factors, including, *inter alia,* the idea's specificity or generality (is it a generic concept or one of specific application?), its commonality (how many people know of this idea?), its uniqueness (how different is this idea from generally known ideas?), and its commercial availability (how widespread is the idea's use in the industry?).  *Cf. Murray,* 844 F.2d at 993 ("In assessing whether an idea is in the public domain, the central issue is the uniqueness of the creation."); *AEB & Assocs.,* 853 F.Supp. at 734 ("[N]ovelty cannot be found where the idea consists of nothing more than a variation on a basic theme."); *Educational Sales Programs,* 317 N.Y.S.2d at 844 (noting that an idea "must show[ ] genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge" in order to be considered original or novel).  Thus, for example, a once original or novel idea may become so widely disseminated over the course of time that it enters the body of common knowledge.  When this occurs, the idea ceases to be novel or original.  *See, e.g., Murray,* 844 F.2d at 989, 991–92 (affirming district court's finding that plaintiff's idea for a television sitcom about "Black American family life" was not novel or original because it "merely combined two ideas which had been circulating in the industry for a number of years—namely, the family situation comedy, which was a standard formula, and the casting of black actors in non-stereotypical roles," even though "the portrayal of a nonstereotypical black family on television was indeed a breakthrough").

■ Moreover, in assessing the interrelationship between originality and novelty to the buyer, we note that in some cases an idea may be so unoriginal or lacking in novelty that its obviousness bespeaks widespread and public knowledge of the idea, and such knowledge is therefore imputed to the buyer.  *See Soule,* 195 N.Y.S. at 575 (noting that the idea that an increase in the wholesale price of groceries would result in an increase in profits was "not new" in 1922, "not original," and left the court "at a loss to understand how it could be deemed valuable").[8]  In such

---

7. The *Keller* court ultimately found insufficient consideration to enforce the contract, however, because the plaintiff owed the defendant a pre-existing duty to share such information.  *Keller,* 255 N.Y. at 98–99, 174 N.E. 74.

8. Although the concept of increasing prices to increase profits may have been unoriginal in

cases, a court may conclude, as a matter of law, that the idea lacks both the originality necessary to support a misappropriation claim and the novelty to the buyer necessary to support a contract claim. *See id.* at 576 ("No person can by contract monopolize an idea that is common and general to the whole world."); *Ed Graham Prods.,* 347 N.Y.S.2d at 769 ("[W]here plaintiff's idea is *wholly lacking in novelty,* no cause of action in contract or tort can stand ....") (emphasis added); *Educational Sales Programs,* 317 N.Y.S.2d at 843–44 ("Nothing is bestowed if the facts of a 'secret' imparted in confidence are already the subject of general knowledge.").

While we find New York case law in this area to be relatively clear when viewed through the prism of *Apfel,* we nonetheless recognize some post-*Apfel* confusion among the courts. Accordingly, we discuss briefly the post-*Apfel* decisions in New York in an effort to address any lingering uncertainty.

In the first of two post-*Apfel* decisions in New York—*Oasis Music, Inc. v. 900 U.S.A., Inc.,* 161 Misc.2d 627, 614 N.Y.S.2d 878 (1994)—the plaintiff alleged that the defendant misappropriated its ideas for an interactive telephone game in violation of a pre-disclosure confidentiality agreement. *See id.* at 880–81. The *Oasis Music* court correctly began its contract analysis by reciting *Apfel*'s "novelty as to the buyer" standard. *See id.* at 881. But after concluding that the various aspects of plaintiff's ideas already existed in the public domain, the court appeared to dismiss plaintiff's claims for lack of novelty generally. *See id.* at 882–84. In light of *Apfel,*

we read the *Oasis Music* opinion to hold that, because plaintiff's ideas had such a high degree of commonality, the ideas were so unoriginal that, as a matter of law, they were non-novel to the buyer. *See id.* at 883 ("Thus, the plaintiff acknowledges that its program is based on ideas and concepts already in the public domain, and has failed to demonstrate the originality or novelty of its theme.").

In the other post-*Apfel* decision in New York—*Marraccini v. Bertelsmann Music Group, Inc.,* 221 A.D.2d 95, 644 N.Y.S.2d 875 (3d Dep't 1996)—the plaintiff alleged that the defendant breached their pre-disclosure agreement and misappropriated his idea for a "Pop TV" music channel. *See id.* at 876. On appeal from the Supreme Court, New York's Appellate Division reiterated *Downey*'s statement that, "[w]hen there is no postdisclosure agreement for the use of an idea, 'no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements.'" *Id.* at 877 (quoting *Downey,* 31 N.Y.2d at 61, 334 N.Y.S.2d 874, 286 N.E.2d 257). We agree with the *Marraccini* court's statement that "*Downey* ... and its progeny remain[ ] intact," *id.,* insofar as that line of cases was clarified by *Apfel,* but we conclude that the *Marraccini* court's reliance on *Downey*'s language for the proposition that the consideration for the contract in contract-based claims must consist of originality or novelty generally—as opposed to just novelty to the buyer—has been foreclosed by *Apfel.*[9] We do not understand

the "Bon Ami" industry in 1922, we express no opinion as to whether today, given the level of competition and complexity in the modern American economy, such an understanding of price elasticity lacks originality or novelty to buyers in other industries.

9. Prior to *Apfel,* this Court relied on the same language from *Downey* to conclude that originality or novelty generally is required for contract-based claims in submission-of-idea cases. *See, e.g., Hudson Hotels Corp. v.*

*Choice Hotels Int'l,* 995 F.2d 1173, 1178 (2d Cir.1993) (concluding that a "threshold finding" of novelty or originality must be made prior to determining the validity of the contractual relationship); *Murray,* 844 F.2d at 994 (dismissing plaintiff's state law claims for breach of implied contract); *see also M.H. Segan Ltd. Partnership v. Hasbro, Inc.,* 924 F.Supp. 512, 523 (S.D.N.Y.1996) (relying on *Hudson*'s and *Murray*'s reading of *Downey* to dismiss implied contract claim). For the rea-

*Apfel's* holding to be limited only to situations where there is an express post-disclosure contract between the parties.

■ In sum, we find that New York law in submission-of-idea cases is governed by the following principles: Contract-based claims require only a showing that the disclosed idea was novel to the buyer in order to find consideration.[10] Such claims involve a fact-specific inquiry that focuses on the perspective of the particular buyer. By contrast, misappropriation claims require that the idea at issue be original and novel in absolute terms. This is so because unoriginal, known ideas have no value as property and the law does not protect against the use of that which is free and available to all. Finally, an idea may be so unoriginal or lacking in novelty generally that, as a matter of law, the buyer is deemed to have knowledge of the idea. In such cases, neither a property-based nor a contract-based claim for uncompensated use of the idea may lie.

In light of New York's law governing submission-of-idea cases, we next consider whether Nadel's toy idea was original or novel in absolute terms so as to support his misappropriation claim and whether his idea was novel as to Play–By–Play so as to support his contract claims.

### B. Nadel's Misappropriation Claim

This Court reviews a district court's grant of summary judgment *de novo*. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir.1998). In so doing, we must consider the evidence in the record in a light most favorable to the non-movant, drawing all reasonable inferences in its favor. *See id.* at 764–65. Summary judgment is appropriate only where there is no genuine issue of material fact. *See id.*

■ In this case, the district court did not decide whether Nadel's idea—a plush toy that sits upright, emits sounds, and spins on a flat surface by means of an internal eccentric motor—was inherently lacking in originality. *See Nadel*, 34 F.Supp.2d at 185 ("[We] need [not] reach the issue of whether combining elements of two commercially available toys to make another toy may be novel or is, as a matter of law, merely a 'clever adaptation of existing technology,' for Play–By–Play has demonstrated that plaintiff's idea was one which was already in use in the industry at the time that it was submitted"). We therefore remand this issue to the district court to determine whether Nadel's idea exhibited "genuine novelty or invention" or whether it was "a merely clever or useful adaptation of existing knowledge." *Educational Sales Programs*, 317 N.Y.S.2d at 844.

■ Moreover, insofar as the district court found that Nadel's idea lacked originality and novelty generally because similar toys were commercially available prior to October 1996, we believe that there remains a genuine issue of material fact on this point. While the record contains testimony of Play–By–Play's toy expert—Bert Reiner—in support of the finding that Nadel's product concept was already used in more than a dozen different plush toys prior to October 1996, the district court cited the "Giggle Bunny" toy as the

---

sons discussed *supra* at 374–77, we believe that *Apfel* squarely refutes that proposition.

**10.** Of course, the mere formation of a contract in a submission-of-idea case does not necessarily mean that the contract has been breached by the defendant upon his use of the idea. In order to recover for breach of contract, a plaintiff must demonstrate some nexus or causal connection between his or her disclosure and the defendant's use of the idea,

*i.e.,* where there is an independent source for the idea used by the defendant, there may be no breach of contract, and the plaintiff's claim for recovery may not lie. *See, e.g., Ferber*, 51 N.Y.2d at 784, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (noting that, even if plaintiff's idea were novel to the defendant at the time of disclosure, his claim would have been extinguished when the idea subsequently fell into the public domain through the issuance of patents disclosing the idea).

only such example. *See Nadel,* 34 F.Supp.2d at 185. Nadel disputes Reiner's contention and claims, furthermore, that the district court erroneously relied on an undated video depiction of the Giggle Bunny toy to conclude that upright, sound-emitting, spinning plush toys were commercially available prior to October 1996.

With respect to the Giggle Bunny evidence, we agree with Nadel that the Giggle Bunny model depicted in the undated video exhibit is physically different from the earlier Giggle Bunny model known to be commercially available in 1994. Drawing all factual inferences in Nadel's favor, we cannot conclude as a matter of law that the upright, sound-emitting, spinning plush Giggle Bunny shown in the video exhibit was commercially available prior to October 1996, and we certainly cannot conclude based on this one exhibit that similar toys were in the public domain at that time.

Moreover, although we find highly probative Mr. Reiner's testimony that numerous toys with the same general characteristics of Nadel's toy idea were commercially available prior to October 1996, his testimony and related evidence are too ambiguous and incomplete to support a finding of unoriginality as a matter of law. Mr. Reiner's testimony fails to specify precisely which (if any) of the enumerated plush toys were designed to (1) sit upright, (2) on a flat surface, (3) emit sounds, and (4) spin or rotate (rather than simply vibrate like "Tickle Me Elmo," for example). Without this information, a reasonable finder of fact could discount Mr. Reiner's testimony as vague and inconclusive.

On remand, the district court is free to consider whether further discovery is warranted to determine whether Nadel's product concept was inherently original or whether it was novel to the industry prior to October 1996. A finding of unoriginality or lack of general novelty would, of course, preclude Nadel from bringing a misappropriation claim against Play–By–Play. Moreover, in evaluating the originality or general novelty of Nadel's idea in connection with his misappropriation claim, the district may consider whether the idea is so unoriginal that Play–By–Play should, as a matter of law, be deemed to have already possessed the idea, and dismiss Nadel's contract claims on that ground.

### C. Nadel's Contract Claims

■■■ Mindful that, under New York law, a finding of novelty as to Play–By–Play will provide sufficient consideration to support Nadel's contract claims, we next consider whether the record exhibits a genuine issue of material fact on this point.

Reading the record in a light most favorable to Nadel, *see Quinn,* 159 F.3d at 764, we conclude that there exists a genuine issue of material fact as to whether Nadel's idea was, at the time he disclosed it to Wasserman in early October 1996, novel to Play–By–Play. Notably, the timing of Play–By–Play's development and release of Tornado Taz in relation to Nadel's October 1996 disclosure is, taken alone, highly probative. Moreover, although custom in the toy industry provides that a company shall promptly return all samples if it already possesses (or does not want to use) a disclosed idea, Play–By–Play in this case failed to return Nadel's prototype monkey toy for several months, despite Nadel's multiple requests for its return. According to Wasserman's secretary, Melissa Rodriguez, Nadel's sample was not returned until after the unveiling of "Tornado Taz" at the New York Toy Fair in February 1997. Ms. Rodriguez testified that from October 1996 through February 1997, Nadel's sample was usually kept in a glass cabinet behind Wasserman's desk, and on one occasion, she remembered seeing it on a table in Wasserman's office. These facts give rise to the reasonable inference that Play–By–Play may have used Nadel's prototype as a model for the development of Tornado Taz.

None of the evidence adduced by Play–By–Play compels a finding to the contrary on summary judgment. With regard to the discussions that Play–By–Play purportedly had in June or July of 1996 about possible ways to create a vibrating or spinning Tazmanian Devil toy, those conversations only lasted, according to Mr. Slattery, "a matter of five minutes." Play–By–Play may have "discussed the concept," as Mr. Slattery testified, but the record provides no evidence suggesting that, in June or July of 1996, Play–By–Play understood exactly *how* it could apply eccentric motor technology to make its Tazmanian Devil toy spin rather than, say, vibrate like Tickle Me Elmo. Similarly, although Play–By–Play asserts that it commissioned an outside manufacturing agent—Barter Trading of Hong Kong—to begin developing Tornado Taz in late September or early October of 1996, Play–By–Play admits that it can only "guess" the exact date. Play–By–Play cannot confirm that its commission of Barter Trading predated Nadel's alleged disclosure to Wasserman on or about October 9, 1996. Nor has Play–By–Play produced any documents, technical or otherwise, relating to its purported business venture with Barter Trading or its independent development of a spinning Tornado Taz prior to October 1996. Based on this evidence, a jury could reasonably infer that Play–By–Play actually contacted Barter Trading, if at all, *after* learning of Nadel's product concept, and that Play–By–Play's development of Tornado Taz is attributable to Nadel's disclosure.

We therefore conclude that there exists a genuine issue of material fact as to whether Nadel's idea was, at the time he disclosed it to Wasserman in early October 1996, novel to Play–By–Play. As to whether the other elements necessary to find a valid express or implied-in-fact contract are present here, *e.g.*, mutual assent, legal capacity, legal subject matter, *see Maas*, 94 N.Y.2d at 93–94, 699 N.Y.S.2d 716, 721 N.E.2d 966, we leave that determination to the district court to address, if

necessary, on remand. *Cf. Nadel*, 34 F.Supp.2d at 184–85 (dismissing contract claim only on ground that Nadel's idea lacked general novelty and thus would not suffice as consideration).

## II. PLAY–BY–PLAY'S COUNTER-CLAIMS

Play–By–Play argues on cross-appeal that the district court erred in granting Nadel's motion for summary judgment on three of its counterclaims: (1) tortious interference with prospective business relations; (2) violations of section 43(a) of the Lanham Act; and (3) unfair competition. For the reasons discussed below, we affirm that part of the district court's judgment granting Nadel's motion for summary judgment and dismissing Play–By–Play's counterclaims.

### A. Tortious Interference With Prospective Business Relations

Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship. *See Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994) (citations omitted). Upon a *de novo* review of the record, *see Quinn*, 159 F.3d at 764, we agree with the district court that Play–By–Play has failed to adduce sufficient evidence to support its claim for tortious interference with business relations.

With respect to Play–By–Play's relations with Wow Wee, Play–By–Play failed to establish by any competent evidence that Wow Wee interrupted its business discussions with Play–By–Play because of anything Nadel said or did. Play–By–Play's allegation is based solely on its "suspicions," which cannot suffice to support a claim for tortious interference. Further-

more, with respect to its relations with Ferber, Play–By–Play had one meeting with Ferber to discuss the potential development of a new toy technology, but no specific details were discussed. Another meeting was scheduled, but Wasserman never appeared for that meeting. Based on these facts, we find that Play–By–Play and Ferber did not have a sufficient "business relation" with which Nadel could have interfered.

## B. Section 43(a) of the Lanham Act & Unfair Competition

■ Both a section 43(a)(1)(B) claim under the Lanham Act and an unfair competition claim under New York common law require that misleading or untruthful statements have been made for the purpose of commercial advertising or promoting a party's goods, services, or commercial activities. *See* 15 U.S.C. § 1125(a)(1)(B) (1994 & Supp.1999) ("Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable...."); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir.1997) (" 'Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent.' ") (quoting *Girl Scouts v. Bantam Doubleday Dell Publ'g Group, Inc.*, 808 F.Supp. 1112, 1131 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 1477 (2d Cir.1993)). Based on our review of the record, we agree with the district court that Nadel's statements to others, if actually made, cannot reasonably be said to have been made for the purpose of commercial advertising or promotion. *See Nadel*, 34 F.Supp.2d at 186.

■ Furthermore, although the district court did not explicitly address the merits of Play–By–Play's counterclaim under section 43(a)(1)(A), we note that Play–By–Play's reliance on that subsection is also misplaced. Section 43(a)(1)(A) of the Lanham Act ordinarily addresses confusion caused by a defendant's trademark and is not so broad as to encompass Nadel's alleged statements to others regarding the intellectual origin of Play–By–Play's "Tornado Taz" toy product. *See* 15 U.S.C. § 1125(a)(1)(A) ("Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading representation of fact, which ·... is likely to cause confusion, or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval *of his or her goods, services, or commercial activities* by another person ... shall be liable ....") (emphasis added); *see also* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, ch. 27 (4th ed.1999) (discussing the scope of section 43(a) of the Lanham Act).

We therefore affirm the district court's grant of Nadel's motion for summary judgment dismissing Play–By–Play's counterclaims.

## CONCLUSION

For the foregoing reasons, we affirm that part of the district court's judgment dismissing Play–By–Play's counterclaims. We vacate that part of the district court's judgment granting Play–By–Play's motion for summary judgment and dismissing Nadel's complaint and remand for further proceedings consistent with this opinion.