**KHREATIVITY UNLIMITED, a Corporation, individually and on behalf of the Khreativity/Kidzart joint venture, Plaintiff,**

v.

**MATTEL, INC., a Delaware corporation, Defendant.**

**No. 99 CIV. 9321 SAS.**

United States District Court, S.D. New York.

May 23, 2000.

Barry I. Fredericks, Howard M. Nashel, Joel M. Ellis, Jason R. Mischel, Nashel Kates Nussman Rapone Ellis & Traum, LLP, Hackensack, NJ, for Khreativity Unlimited, Inc.

Robin A. Henry, Anne E. Beaumont, Boies, Schiller & Flexner LLP, Armonk, NY, John B. Quinn, Helen Heekyong Chae, Quinn Emanuel Urquhart Oliver & Hedges LLP, Los Angeles, CA, for Mattel.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Defendant Mattel, Inc. ("Mattel") moves for summary judgment on both claims filed against it by plaintiff Khreativity Unlimited, Inc. ("Khreativity"). In January 1998, Mattel entered into a licensing agreement with the National Basketball Association ("NBA") to produce a variety of NBA-related toys. Khreativity claims that the idea for this licensing agreement came

from a series of meetings and phone calls between Khreativity, Mattel and the NBA in April and May 1998. In its Complaint, Khreativity alleges that Mattel breached an express or implied-in-fact contract to pay Khreativity a finder's fee for its concept and that Mattel was unjustly enriched by Khreativity's concept.

Mattel argues that New York law applies to both of plaintiff's claims and that, under New York law, plaintiff cannot prevail. While Khreativity admits that New York law applies to its finder's fee claim, it argues that California law applies to its unjust enrichment claim and that, under the applicable law, both claims should survive summary judgment. For the reasons set forth below, Mattel's motion for summary judgment is granted.

## I. FACTS AND PROCEDURAL HISTORY

Khreativity, a New Jersey corporation, maintains its principal place of business in New Jersey; Meridyth Mischel Webber, a New Jersey resident, is the President and sole shareholder of Khreativity. *See* Stipulation of Facts ¶¶ 1–2. Kidzart, Inc. ("Kidzart"), a New York corporation, maintains its principal place of business in Texas and has an office in New York; Ruth Morace is the President and sole shareholder of Kidzart. *See id.* ¶¶ 3–4. Mattel, a Delaware corporation, maintains its principal place of business in California. *See id.* ¶ 10.

Four times each year, Mattel holds an Inventor Sweep in New York. *See id.* ¶ 12. During an Inventor Sweep, personnel from Mattel's Outside Resources department hold prescheduled meetings with toy inventors to review potential toy ideas. *See id.* On or about April 23, 1996, Mattel hosted an Inventor Sweep (the "April 1996 Inventor Sweep") that was attended by 35 to 40 inventors. *See id.* ¶ 13.

At the April 1996 Inventor Sweep, Morace and Webber presented an idea that Kidzart entitled the NBA Commemorative Doll to Jamie Filipeli of Mattel's Outside Resources department. *See id.* ¶ 17.[1] The prototype NBA Commemorative Doll consisted of a Mattel Cabbage Patch Kid doll (which Morace or Webber purchased from a retail source) dressed in a uniform bearing the logo of the New Jersey Nets, an NBA team. *See id.* Morace also gave Mattel a written description of the NBA Commemorative Doll. *See id.* ¶ 18 & Ex. C (written description). Prior to the meeting with Filipeli, Morace completed and signed a Mattel Product Disclosure Form, which discloses the name and contact information for an inventor, along with the title and a short description of the inventor's potential toy idea. *See id.* ¶¶ 14–16 & Ex. B (Product Disclosure Form). Morace gave the form to Filipeli at their meeting. *See id.* ¶ 16. Following the meeting, Filipeli indicated on the Product Disclosure form her intention to show the NBA Commemorative Doll idea to Gene Garlock, Mattel's Vice President for Entertainment and Licensing. *See id.* ¶¶ 20–21.

Following the April 1996 Inventor Sweep, Webber (in New Jersey) telephoned both Garlock (in California) and Greg Lassen (in New York), an employee of NBA Properties, Inc. ("NBA Properties"), to arrange a meeting in New York. *See id.* ¶¶ 22–24. According to plaintiff, Webber spoke with Garlock on more than one occasion and, during one of these conversations, Garlock told Webber that if a deal was made, Khreativity would be entitled to a finder's fee. *See* Complaint ¶ 13; Affidavit of Meridyth Webber ("Webber Aff.") ¶ 4. On May 5, 1996, Webber sent Garlock a letter at the Waldorf–Astoria hotel in New York, confirming their upcoming meeting and notifying Garlock that she had arranged for the attendance of "the senior representative in charge of li-

---

1. On or about April 26, 1996, Kidzart and Khreativity signed a joint venture agreement

related to the NBA Commemorative Doll. *See id.* ¶ 5 & Ex. A (joint venture agreement).

censing for the [NBA]." *See id.* ¶ 25 & Ex. D (May 5, 1996 letter from Webber to Garlock). In her letter, Webber gave as a contact number the telephone number of Kidzart's New York office, which is also Morace's residence. *See id.* ¶ 26.

On or about May 8, 1996, Webber and Morace met with Garlock and Lassen at the offices of NBA Properties in New York ("May 8 meeting"). *See id.* ¶ 27. Plaintiff makes several allegations concerning the substance of the May 8 meeting. *First,* plaintiff alleges that the parties discussed a number of ideas besides the NBA Commemorative Doll. *See* Opp. Mem. at 5. Specifically, plaintiff alleges that they discussed: (1) releasing Mattel's Barbie doll dressed in the uniform of an NBA or WNBA team; (2) using stick-on letters and numbers to personalize uniforms; and (3) designing a more expensive doll utilizing clothing and apparel from the NBA and WNBA. *See id.;* Webber Aff. ¶ 6. *Second,* plaintiff alleges that Garlock reaffirmed his earlier promise that Khreativity would be entitled to a finder's fee. *See* Opp. Mem. at 5; Webber Aff. ¶ 8. *Third,* plaintiff alleges that Garlock told Webber and Morace that their ideas would be submitted for consideration by Jeanne Olson, Mattel's Senior Vice President and General Manager of Large and Small Dolls. *See* Opp. Mem. at 5. *Fourth,* plaintiff alleges that, at the conclusion of the meeting, Garlock invited Lassen to come to California the following week, to further discuss an arrangement between Mattel and the NBA. *See id.* at 5–6.

The following day, Morace and Webber (from New York) wrote Lassen (in New York) to thank him for meeting with them. *See* May 9, 1996 Letter from Morace and Webber to Lassen, Ex. E to the Affidavit of Robin A. Henry, counsel for Mattel ("Henry Aff."). In their letter, Morace and Webber stated:

> We are looking forward to a[n] N.B.A. doll and/or doll fashions as being a successful concept for all parties involved. As I suggested, it would also be wonderful to mark the introduction of the N.B.A. Women's teams with a doll line featuring all of the appropriate official uniforms and logos for each of the new 8 teams.

*Id.* On May 13, 1996, Garlock (in California) sent a letter to Morace (in New York). *See* Stipulation of Facts ¶ 28 & Ex. E (May 13, 1996 letter from Garlock to Webber). That letter stated:

> I have passed your Cabbage Patch NBA prototype on to Jeanne Olson, SVP/General Manager Large and Small Dolls. Although she thought it was an interesting concept, if [sic] is not on strategy with the overall marketing of the brand. Enclosed, please find the sample. Thank you for your submission and your continued interest in working with Mattel.

*Id.*

On October 2, 1996, Webber sent a letter to Mary Pat Gillin of NBA Properties. *See* October 2, 1996 letter from Webber to Gillin, Ex. F. to Henry Aff. In that letter, Webber informed Gillin that she previously had discussed with Lassen her concept of dolls using NBA logos, "an original idea which Mr. Lassen acknowledged had never been proposed before." *Id.* Webber also described the May 8 meeting, noting that "[a]t this meeting it was again stated that I was the first person to have brought to the NBA the idea of a doll using NBA team logos." *Id.* Lassen responded to this letter on October 25, 1996, informing Webber that he was "shocked by certain of [her] comments" and denying that he had stated that her idea was original or that she was the first person to have brought the idea to the NBA. *Id.* & Ex. G (October 25, 1996 letter from Lassen to Webber). Lassen also told Webber that, contrary to the suggestion in her letter, the NBA had no obligation to inform her if it went forward with an NBA doll. *See id.*

On or about January 21, 1998, Mattel entered into a Retail Product License Agreement (the "License Agreement")

with NBA Properties, which gave Mattel world-wide rights to NBA-themed merchandise across all Mattel toy categories, including Barbie, large dolls, games, radio-control vehicles, Sesame Street, Cabbage Patch Kids, Hot Wheels, Matchbox, plush toys and arts and crafts. *See* Stipulation of Facts ¶ 30. Mattel has never sold or otherwise released a Cabbage Patch Kid doll dressed in an NBA team uniform. *See id.* ¶ 31. In 1998, Mattel released a Cabbage Patch Kid doll dressed in a non-team-specific, non-NBA basketball uniform and holding a basketball. *See id.* ¶ 32.

On July 21, 1999, Khreativity sued Mattel in the United States District Court for the District of New Jersey (the "New Jersey District Court"), alleging breaches of an express or implied-in-fact contract and a quasi-contract. *See* Complaint. The breaches involved both Mattel's alleged promise to pay Khreativity a finder's fee for bringing Mattel and the NBA together and Mattel's alleged unjust enrichment through its use of both Khreativity's idea for an NBA Commemorative Doll and Khreativity's efforts and contacts to arrange an introduction of Mattel and the NBA. *See id.* On August 23, 1999, the New Jersey District Court transferred the case sua sponte to this Court, pursuant to 28 U.S.C. §§ 1404 and 1406(a), stating that it appeared that "the allegations of the Complaint do not support venue in this judicial district." *See* August 23, 1999 Order. Mattel now seeks summary judgment in its favor on both of plaintiff's claims.

## II. DISCUSSION

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.1996). The moving party has the burden of identifying the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). The Second Circuit has offered the following summary of the relevant standard:

> While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law. A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial.

*Mitchell v. Washingtonville Central School District*, 190 F.3d 1, 5 (2d Cir.1999) (quotation marks and citations omitted). In determining whether summary judgment should be granted, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See D'Amico v. City of New York*, 132 F.3d 145, 148 (2d Cir.1998), *cert. denied*, 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998).

Because the New Jersey District Court transferred the case pursuant to section 1406(a), both parties agree that this Court must apply the law of the Southern District of New York, not the District of New Jersey, in resolving Mattel's motion. *See Schaeffer v. Village of Ossining*, 58 F.3d 48, 50 (2d Cir.1995) ("Following a section 1406(a) transfer, ... the transferee court should apply whatever law it would have applied had the action been properly commenced there.") (quotation marks and citation omitted). In addition, because this Court is exercising its diversity jurisdiction, both parties agree that this Court must apply New York's choice-of-law rules. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware

must conform to those prevailing in Delaware's state courts."). But the agreement ends there. The parties disagree about both the application of New York's choice-of-law rules to plaintiff's claim for unjust enrichment and the application of the relevant substantive law to both of plaintiff's claims.

## A. Finder's Fee Claim

The parties agree that New York substantive law applies to plaintiff's claim for a finder's fee. Under New York law, the Statute of Frauds, N.Y. Gen. Oblig. Law § 5–701(a)(10), applies to such claims. *See Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 789 n. 2 (2d Cir.1986) ("There is no doubt that [NY Gen. Oblig. Law] § 5–701(a)(10) bars oral finder's fee contracts."); *see also Millennium Capital Markets LLC v. U.S. National Leasing Corp.*, No. 97 Civ. 8397, 1999 WL 311923, at *3 (S.D.N.Y. May 18, 1999) ("It is well settled in New York that, under [§ 5–7(a)(10) ], a party may not state a finder's fee claim based upon an oral agreement.") (quotation marks and citation omitted). Plaintiff admits that its claim for a finder's fee is not supported by any writings, but nevertheless makes two arguments as to why the Statute of Frauds does not bar its claim.

■ *First*, plaintiff argues that judicial admissions can overcome a Statute of Frauds defense. *See* N.Y. Gen. Oblig. Law § 5–701(b)(3)(c) ("There is sufficient evidence that a contract has been made if ... [t]he party against whom enforcement is sought admits in its pleading, testimony or otherwise in court that a contract was made."); *see also Scholastic, Inc. v. Harris*, 80 F.Supp.2d 139, 148 (S.D.N.Y.1999) (citing § 5–701(b)(3)(c)). But this exception to the Statute of Frauds is inapposite, because Mattel has never admitted that it agreed to pay plaintiff a finder's fee. Mattel simply stipulated that: (1) Webber ar-

ranged the May 8 meeting; (2) Webber wrote Garlock a letter on May 5, 1996, confirming that meeting; and (3) Mattel entered into the License Agreement with the NBA on January 21, 1998. *See* Stipulation of Facts ¶¶ 22–27, 30. Even drawing all reasonable inferences in plaintiff's favor, these stipulations do not amount to an admission that Mattel agreed to pay plaintiff a finder's fee. *See American Steel Erectors, Inc. v. Lehrer McGovern Bovis, Inc.*, No. 94 Civ. 6253, 1997 WL 122761, at *5 n. 7 (S.D.N.Y. Mar.18, 1997) ("A judicial admission of the existence of a contract must be clear and unequivocal to take the contract out of the statute of frauds.").

■ *Second*, plaintiff argues that Mattel's Statute of Frauds defense cannot defeat its quantum meruit claim for a finder's fee. In *Springwell Corp. v. Falcon Drilling Co.*, 16 F.Supp.2d 300 (S.D.N.Y.1998), Judge Sotomayor thoroughly analyzed the viability of quantum meruit claims for finder's fees under New York's Statute of Frauds:

[C]ourts have, at a minimum, required the writing relied upon to establish clearly the existence of the alleged finder's agreement and its subject matter. While written acknowledgment by the defendant of the plaintiff's performance has been found to be persuasive evidence of an agreement's existence, courts have not uniformly required it. On the other hand, courts have dismissed quantum meruit claims under the Statute of Frauds where the writing relied upon failed to establish that the defendant actually agreed to pay a finder's fee, or where the writings left ambiguity as to whether the agreement's terms covered the transaction upon which a fee was claimed.

*Id.* at 305–06 (citations omitted).[2] Plaintiff relies on Mattel's alleged "admissions" to

---

**2.** On September 23, 1998, Judge Sotomayor granted a motion for reconsideration in *Springwell,* reversing her grant of summary

judgment. *See id.* at 311–19. That reversal was based on new documentary evidence of an agreement, however, not on any change in

support its quantum meruit claim but, as explained above, those "admissions" are insufficient.

In an effort to draw all reasonable inferences in plaintiff's favor, I have also reviewed the May 5 letter from Webber to Garlock. In that letter, Webber indicated that she had arranged for a NBA representative to be present at the May 8 meeting in order to discuss "the possibilities for future joint projects between Mattel and the N.B.A." Stipulation of Facts, Ex. D. Although the letter does suggest that Webber brought Mattel and the NBA together, it provides no evidence that Mattel agreed to pay Webber a finder's fee for the introduction. Accordingly, Mattel's motion for summary judgment on plaintiff's claim for a finder's fee is granted.

### B. Unjust Enrichment Claim

■ The parties disagree about the applicable substantive law governing Khreativity's unjust enrichment claim. "For contract claims . . ., New York uses a 'center of gravity' or 'grouping of contacts' analysis: the jurisdiction with the most contacts to the contract in question has the greater interest in seeing its law apply to the interpretation and enforcement of the contract." *Alonso v. Saudi Arabian Airlines Corp.,* No. 98 Civ. 7781, 1999 WL 244102, at *5 (S.D.N.Y. Apr.23, 1999). Under the "center of gravity" approach, courts may consider a number of factors: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter; and (5) the domicile or place of business of the contracting parties. *See id.; see also Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030–31 (2d Cir. 1996) (listing factors). Khreativity argues that California has the greatest interest in

seeing its law applied here; Mattel makes the case for New York.

Even a cursory analysis reveals that New York has more significant contacts with the alleged contract. Two of the factors—the place of negotiation and the place of contracting—clearly weigh in New York's favor. Plaintiff submitted its idea to Mattel in New York, during Mattel's quarterly solicitation of toy ideas. The only other meeting between plaintiff and Mattel also took place in New York. Although plaintiff points to some correspondence between Webber in New York and Garlock in California, virtually all negotiations and contracting (to the degree there was any contracting at all) took place in New York. Two other factors—the place of performance and location of the parties—provide no clear answer. The place of performance is unclear because, while Mattel probably would have produced the dolls in California, NBA Properties is located in New York and the dolls would have been distributed across the country. As for the location of the parties, Kidzart, which participated in the joint venture with Khreativity, is a New York corporation; Mattel has its principal place of business in California.[3]

Khreativity relies heavily on *Levin v. The Gap,* No. 97 Civ. 4452, 1998 WL 915897 (S.D.N.Y. Dec.30, 1998), an idea submission case in which Judge Chin ruled that California, not New York, law applied. Khreativity identifies facts in *Levin* that are similar to facts in this case: (1) the plaintiff was a New York resident; (2) the defendant was a Delaware corporation with its principal place of business in California; (3) the rejection letter was sent from California to New York; and (4) the plaintiff alleged, among other things, that the defendant was unjustly enriched by using his idea without compensation. De-

the analysis of the legal issues. *See id.* at 315–17.

**3.** The final factor—the location of the subject matter of the contract—is not significant in this case, because the alleged contract does

not deal with "a specific physical thing . . . or afford[ ] protection against a localized risk." Restatement (Second) of Conflict of Laws § 188, cmt. e.

**184**

spite these facial parallels, *Levin* is easily distinguishable from the case at bar, because the plaintiff in *Levin* did not meet with representatives of the defendant in New York, either to submit his idea initially or discuss it further. Rather, he mailed his idea to the defendant in California and then participated in a series of letters and phone calls between New York and California; the physical location and residence of the plaintiff constituted the extent of New York's contacts. Because New York has much more significant contacts in this case—contacts that outweigh California's—New York law applies to Khreativity's unjust enrichment claim.

■ Khreativity alleges that Mattel was unjustly enriched because it used Khreativity's idea without paying any compensation. *See Boyle v. Stephens, Inc.*, No. 97 Civ. 1351, 1997 WL 760498, at *2 (S.D.N.Y. Aug. 26, 1997) ("[T]o prevent unjust enrichment, a plaintiff may recover on a quasi-contract (an as if contract) for that reasonable value.") (quotation marks and citation omitted); *see also AEB & Associates Design Group, Inc. v. Tonka Corp.*, 853 F.Supp. 724, 731 (S.D.N.Y.1994) ("[A] quasi contract ... is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment.") (quotation marks and citation omitted). In order to sustain a claim for unjust enrichment, plaintiff must demonstrate that: (1) defendants were enriched; (2) such enrichment was at plaintiff's expense; and (3) under the circumstances it would be unjust not to compensate plaintiff. *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir.1997).

Mattel persuasively argues that it was not unjustly enriched by Khreativity's idea for an NBA Commemorative Doll, because it never produced an NBA Commemorative Doll. The record is clear that Mattel returned the prototype doll to plaintiff and never produced the suggested product.

*See* Stipulation of Facts ¶¶ 29, 31. But Khreativity's idea is not so limited. Plaintiff alleges that, at the May 8 meeting, Webber "presented a number of cross-marketing ideas for Mattel and the NBA, including the idea for Mattel's 'Barbie' doll to be dressed in specific NBA and [WNBA] team uniforms." Webber Aff. ¶ 6. Although Mattel's papers in support of its motion for summary judgment mainly address the narrow question of whether Mattel was unjustly enriched by the NBA Commemorative Doll idea, plaintiff has always framed its allegations more broadly. *See* Complaint ¶ 28 ("By having used plaintiff and plaintiff's efforts and contacts to arrange an introduction to the N.B.A. that led to a licensing agreement between the defendant and the N.B.A., the defendant Mattel has been unjustly enriched at the expense of the plaintiff."); Opp. Mem. at 13 ("Mattel's position that it 'rejected and never produced the proposed doll' must fail due to language in its own product disclosure form and its attendance of [sic] a meeting whereby plaintiffs [sic] submitted additional ideas that were subsequently used by defendant."). As a result, it is also necessary to decide whether Mattel was unjustly enriched by plaintiff's presentation of the idea of a cross-marketing venture between Mattel and the NBA.[4]

"[W]hen one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements." *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 877, 286 N.E.2d 257 (1972). Mattel argues it was not unjustly enriched by the cross-marketing idea because that idea was not novel. The Second Circuit recently clarified the relevant standard for assessing whether Khreativity's idea was novel under New York law:

---

**4.** On the other hand, Khreativity's idea does not include its introduction of Mattel to the NBA. An introduction is not an idea, and the

Court already has rejected Khreativity's claim for a finder's fee. *See supra* Part II.A.

For contract-based claims in submission-of-idea cases, a showing of novelty to the buyer will supply sufficient consideration to support a contract.... While an idea may be unoriginal or non-novel in a general sense, it may have substantial value to a particular buyer who is unaware of it and therefore willing to enter into contract to acquire and exploit it. "[T]he buyer may reap benefits from such a contract in a number of ways—for instance, by not having to expend resources pursuing the idea through other channels or by having a profit-making idea implemented sooner rather than later."

*Nadel v. Play–by–Play Toys & Novelties, Inc.,* 208 F.3d 368, 376–77 (2d Cir.2000) (quoting *Apfel v. Prudential–Bache Securities, Inc.,* 81 N.Y.2d 470, 600 N.Y.S.2d 433, 436, 616 N.E.2d 1095(1993)).[5] Because Khreativity's claim is contract-based, the next question is whether the cross-marketing idea was novel to Mattel, not novel in absolute terms.

Although the "novel to the buyer" standard "involve[s] a fact-specific inquiry that focuses on the perspective of the particular buyer," the Second Circuit indicated that summary judgment is possible:

[I]n some cases an idea may be so unoriginal or lacking in novelty that its obviousness bespeaks widespread and public knowledge of the idea, and such knowledge is therefore imputed to the buyer.... In such cases, a court may conclude, as a matter of law, that the idea lacks both the originality necessary to support a misappropriation claim and the novelty to the buyer necessary to support a contract claim.

*Nadel,* 208 F.3d at 378–79 (citations omitted). After *Nadel,* the general novelty cases are no longer controlling for contract-based claims. *See, e.g., Murray v. National Broadcasting Co.,* 844 F.2d 988, 992–94 (2d Cir.1988) (applying general novelty standard to contract-based claim). Nevertheless, those cases remain relevant to the issue of whether an idea is so lacking in novelty that knowledge of the idea can be imputed to the buyer. *See Nadel,* 208 F.3d at 379 (construing *Oasis Music, Inc. v. 900 USA, Inc.,* 161 Misc.2d 627, 614 N.Y.S.2d 878 (Sup.Ct.N.Y.Co.1994), "to hold that, because plaintiff's ideas had such a high degree of commonality, the ideas were so unoriginal that, as a matter of law, they were non-novel to the buyer.").

■ After reviewing the evidence submitted by both parties, I conclude that, as a matter of law, Khreativity's idea for a cross-marketing venture between Mattel and the NBA was so unoriginal and lacking in novelty that knowledge of the idea can be imputed to Mattel. Mattel has proffered uncontroverted evidence that, prior to the submission of Khreativity's idea, Mattel dressed its dolls in a variety of generic sports uniforms, including basketball uniforms. *See* Affidavit of Pamela Peretz, Operations Manager in Mattel's Interactive Software Department ¶ 4, Exs. A–L (Mattel product catalogs). Mattel also dressed its dolls in Olympic uniforms and Ice Capades outfits, which demonstrates that Mattel already had the idea of partnering its toys with a sporting event before its meeting with Khreativity. *See id.* at Exs. B, C, I, J, K, L. "[W]here ... an idea consists in essence of nothing more than a variation on a basic theme ... novelty cannot be found to exist." *Murray,* 844 F.2d at 993. Khreativity's idea was nothing more than a variation on concepts already employed by Mattel—dressing dolls in sports uniforms and, more specifically, dressing dolls in uniforms connected to a sporting event. In order to support a claim for unjust enrichment:

[T]he idea need not reflect the flash of genius, but it must show[ ] genuine novelty and invention, and not a merely clever or useful adaptation of existing

---

**5.** Both parties submitted supplemental letters to explain how *Nadel* strengthened their argu-

ments for or against summary judgment.

knowledge.... Improvement of standard technique or quality, the judicious use of existing means, or the mixture of known ingredients in somewhat different proportions—all the variations on a basic theme—partake more of the nature of elaboration and renovation than of innovation.

*Educational Sales Programs, Inc. v. Dreyfus Corp.,* 65 Misc.2d 412, 317 N.Y.S.2d 840, 844 (Sup.Ct.N.Y.Co.1970). Khreativity's idea simply lacks the requisite innovation to support its claim.

Examination of two other cases that employed the "novelty to the buyer" standard confirms the appropriateness of summary judgment in this case. In *Nadel,* the plaintiff submitted to the defendant a prototype of a spinning, sound-emitting monkey toy. Four months later, the defendant released a spinning, sound-emitting Tazmanian Devil toy that used the same technology. The Second Circuit ruled that summary judgment was inappropriate because the timing of the toy's release, combined with the defendant's failure to return the plaintiff's prototype prior to that release, gave rise "to the reasonable inference that [the defendant] may have used [the plaintiff's] prototype as a model for the development of [its toy]." *Nadel,* 208 F.3d at 381–82. In this case, by contrast, Mattel entered into the Licensing Agreement with the NBA twenty months after its meeting with Khreativity and, of course, plaintiff's idea for a cross-marketing venture did not involve a prototype.

This case more closely resembles *Oasis Music,* in which the plaintiff disclosed its idea for an interactive telephone game to the defendants, who allegedly incorporated some of plaintiff's programming features into their own interactive telephone game. The court ruled that none of plaintiff's programming features were novel, because they either already existed or were variations on a basic theme. *See Oasis Music,* 614 N.Y.S.2d at 882–84. For example, although the plaintiff contended that his game included a feature known as "skip

logic" that allegedly improved on the standard "linear logic" format, the court ruled that "skip logic" was a variation on a basic theme and a "mere adaptation or natural progression" of the "linear logic" concept. *Id.* at 883. This case presents a similar situation, because Khreativity's idea for a cross-marketing venture was simply a variation on Mattel's earlier doll-marketing efforts.

Viewed with all reasonable inferences drawn in plaintiff's favor, the facts demonstrate only that Mattel had not approached the NBA about a cross-marketing venture. For example, plaintiff alleges that Lassen, the NBA representative at the May 8 meeting, told Webber "that her cross-marketing ideas were 'original' and that Webber was the 'first person to have brought to the NBA the idea of a doll using NBA team logos.'" Webber Aff. ¶ 7. The reasonable inference from this statement was that Mattel had never approached the NBA with the idea for a cross-marketing venture, not that Mattel had never considered pairing its dolls with sports uniforms. Indeed, as mentioned above, it had previously done so on several occasions. Similarly, plaintiff arranged the May 8 meeting between Mattel and the NBA, contacting both parties independently. *See* Stipulation of Facts ¶¶ 22–24 & Ex. D (May 5, 1996 letter from Webber to Garlock). This raises the reasonable inference that Mattel had no prior relationship with the NBA, but nothing more.

Simply put, the fact that Mattel never asked the NBA to participate in a cross-marketing venture does not mean that the venture was a novel idea. *See Murray,* 844 F.2d at 992 (fact that NBC had never televised a show embodying plaintiff's idea did not mean that plaintiff's idea was novel); *see also Brandwynne v. Combe International, Inc.,* 74 F.Supp.2d 364, 376 (S.D.N.Y.1999) ("Even assuming, arguendo, that plaintiffs provided a compilation of elements never before offered to the public, plaintiffs' idea nevertheless lacks novelty because a combination of pre-existing

elements is not considered novel."). The record evidence, with all inferences drawn in plaintiff's favor, simply does not overcome the conclusion that plaintiff's idea was so unoriginal and lacking in novelty that knowledge of the idea can be imputed to Mattel. Accordingly, Mattel is entitled to summary judgment on plaintiff's unjust enrichment claim.

## III. CONCLUSION

For the foregoing reasons, Mattel's motion for summary judgment is hereby GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED: